STATE OF VERMONT
ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| In re: Simpson Development Corporation | } | Docket No. 54-3-05 Vtec |
| (Appeal of Prelim. Plat | } | |
| and PRD determinations) | } | |

## Decision

This matter concerns the subdivision and development of a 3.95± acre parcel of land in the scenic gateway of the Town of Norwich (Town). It was heard on the merits at the Windsor County District Court in White River Junction, Vermont, before Environmental Judge Thomas S. Durkin on October 14, 2005, November 4, 2005, and November 29, 2005. At the conclusion of the merits hearing and at the parties' request, the Court afforded the parties an opportunity to file supplements to their proposed Findings of Fact and Conclusions of Law, as well as post-trial motions and memoranda. All such filings were completed on January 11, 2006, at which time the Court took this matter under advisement.

This appeal was filed on behalf of the Applicant, Simpson Development Corporation, which is represented by Paul Gillies, Esq. The Town appeared in this proceeding and presented evidence and legal arguments through its attorney, Frank H. Olmstead, Esq. No other party participated or appeared in this proceeding.

## Preliminary Issue – Motion to Strike
## Prior DRB Determination (Appellant's Exhibit 3)

At trial, Appellant offered into evidence (as Exhibit 3) the October 28, 2004 Decision of the Norwich Development Review Board (DRB) regarding Appellant's prior application for preliminary plan review of its proposed subdivision and Planned Residential Development (PRD) plans. The Norwich Subdivision Regulations (NSR) follow a practice common in a number of Vermont municipalities that includes a multi-phased review of proposed subdivisions, especially subdivisions which are deemed to be "major." See NSR §§ 2.1 through 2.5, inclusive. The October 28 DRB Decision granted preliminary plan approval[1] to Appellant-Applicant's

---

[1] NSR § 2.3 uses the term "determination." However, the October 28 Decision specifically notes that the "DRB approves the Preliminary Site Plan based on the findings of fact and conclusions of law as outlined" in the Decision. October 28 DRB Decision at 4 (emphasis added).

proposed subdivision and PRD plans. Preliminary subdivision approval is the second stage of a four-stage process for major subdivision review under NSR Article 2.

The Town objected to the admission of Appellant's Exhibit 3 and the Court initially ruled Exhibit 3 was inadmissible. However, during the course of the second day of trial, Appellant requested that the Court reconsider its admissibility ruling on Exhibit 3, based upon the general premise that this Court, when hearing appeals from municipal panels, stands in the place of the panel appealed from. We have been advised and cautioned that the "reach of the [environmental] court . . . is as broad as the powers of a zoning board of adjustment or a planning commission, but it is not broader." In re Torres, 154 Vt. 233, 235 (1990).

In the present appeal, the Court is considering Appellant's application for "intermediate plan review" under NSR § 2.4. During the course of the DRB's consideration of Appellant's application for intermediate plan approval, the DRB would have had before it the prior Decision granting preliminary plan approval. Over the Town's objection, the Court granted Appellant's request to reconsider and admitted Exhibit 3, for the purpose of establishing the record that would have been before the DRB, and therefore should be before the Court in this appeal, when considering Appellant's application for intermediate plan review under NSR § 2.4.

Now pending before the Court is the Town's renewed Motion to Strike Exhibit 3. The Town in its Motion renews its objections to the admittance of Exhibit 3, particularly that the admission of this Exhibit would violate the very nature of de novo appeals, as outlined by our Supreme Court in In re Poole, 136 Vt. 242 (1978), Chioffi v. Winooski Zoning Board, 151 Vt. 9 (1989) and In re Stowe Club Highlands, 164 Vt. 272 (1995).

The Town's reliance on the Poole, Chioffi and Stowe Clubs cases is mistaken, for the principal reason that Exhibit 3 is not a copy of the decision appealed from in this proceeding, but rather is a copy of a prior decision which was not appealed by any party. As such, Exhibit 3 does not violate the mandate from Poole and its progeny that de novo appeals require the reviewing court to hear "[a]ll the evidence anew" and to render its own factual determinations "as though no decision had previously been rendered." Poole, at 245.

Under Article 2 of the Norwich Subdivision Regulations, an applicant seeking intermediate or final subdivision approval must first submit a preliminary plan to the Norwich

Planning Commission.[2] NSR § 2.3. Thus, Exhibit 3 evidences that the Applicant here fulfilled at least one prerequisite for intermediate or final subdivision approval: submitting a preliminary subdivision plan and having it reviewed by the appropriate municipal panel. Exhibit 3 is relevant and admissible on those grounds.

In response to the Town's Motion to Strike, Appellant-Applicant raised a related issue: whether a preliminary subdivision determination that has not been appealed from is binding upon the parties, including the municipality, pursuant to 24 V.S.A. § 4472. Preliminary, intermediate and final review of major subdivisions have been the subject of many appeals to this Court, but it appears that the issue of finality of preliminary subdivision determinations is one of first impression for us.[3] Some guidance on this issue appears in the specific ordinance provisions. NSR § 2.4 emphasizes that "[a]pproval of the intermediate plan and associated plat shall not constitute approval of the final subdivision plan and plat."

No party here is suggesting that preliminary subdivision approval should constitute final subdivision approval. However, if preliminary determinations are to mean anything, Appellant asserts, they must be read as providing some finality on the issues decided and not appealed at the various stages of the subdivision review process. We agree.

Our analysis begins with the importance of the basic premise of finality in land use litigation. Any party who fails to appeal an adverse determination made by an appropriate municipal panel is bound by that determination and may not "contest, either directly or indirectly, the decision . . . in any proceeding . . . ." 24 V.S.A. § 4472(d) (2005). The sometimes harsh reality of this finality rule, particularly as it relates to municipalities, was shown in In re Tekram Partners, et. al., 2005 Vt. 92, where a certificate of occupancy issued by a zoning administrator was held to bar a subsequent municipal enforcement action for alleged as-built deviations from the approved plans. The Supreme Court held that the municipality, like any aggrieved interested person as defined under 24 V.S.A. § 4465(b)(2), must file a timely appeal or be forever bound by the determination made below. In Tekram Partners, the Court specifically

---

[2] Since Appellant-Applicant simultaneously submitted his preliminary subdivision plan with his PRD application under § 12 of the Norwich Zoning Regulations, the preliminary subdivision plan and PRD applications were reviewed concurrently by the DRB, and not the Planning Commission.

[3] But see In re Appeal of Gulli, 174 Vt. 580 (2002), where the Supreme Court affirmed a dismissal by this Court of an appeal from a final subdivision determination. The Supreme Court noted that the failure of appellants to file a proper appeal from a prior DRB decision approving a subdivision and PUD application "deprives the environmental court of jurisdiction" to hear challenges to the subdivision and PUD approval in a later appeal of the DRB's subsequent approval of the "Final Parcel Map" submitted by the developer. Id. at 581, 583.

concluded that the importance of "assuring parties of finality" bars a municipality from enforcing its prior permit conditions when the alleged violations in construction were apparent to the zoning administrator at the time of the issuance of the certificates of compliance. Id. at ¶¶ 7–10. The Court did not explain how a municipality was to foresee the need to appeal, on fifteen days notice, the impropriety of its own zoning administrator's determination. The perceived harshness of this legal conclusion reinforces the importance of the finality rule and its binding effect upon municipalities that render land use determinations.

Decisions on major subdivision applications complicate the application of the finality rule, because municipal reviews of such applications often involve multiple stages of review. But a careful reading of the applicable ordinance provisions and the preliminary DRB determination, together with a determination of what aspects of Appellant-Applicant's plan were presented to the DRB for preliminary review and not requested to be changed, leads us to conclude that finality applies to preliminary subdivision and PRD determinations. We discuss the implications of our ruling in more detail below. But we announce our conclusion on these preliminary issues here: the Town's motion to strike must be denied, and in doing so, we conclude that the October 28, 2004 DRB Decision granting preliminary approval provides for finality on certain legal determinations properly made at that stage of the subdivision review proceeding, given that the Town did not appeal that preliminary determination.

## Procedural Background

As noted above, this appeal concerns subdivision and PRD applications that reached the intermediate or third stage of review under the Norwich Regulations. Subdivisions in Norwich may first be presented in a 'pre-application meeting" under NSR § 2.2, which affords all subdivision applicants with an opportunity "to discuss preliminary conceptual plans, the subdivision process, and to review the standards set forth in Article 3 [the NSR Planning and Design Standards]." NSR § 2.2(a).

As noted above, Appellant-Applicant submitted its proposed subdivision plan for preliminary review and received preliminary approval from the DRB on October 28, 2004. Appellant-Applicant concurrently applied for PRD approval pursuant to § 12 of the Norwich

Zoning Regulations (NZR).[4] The October 28 DRB Decision includes Findings of Fact, Conclusions of Law, Proposed Conditions, Recommended Changes and Requests for Further Documentation.

Subsequent to the October 28 DRB Decision, Appellant-Applicant submitted a revised plan for its subdivision and PRD on November 12, 2004, and requested that it be granted a waiver of the need for intermediate review under NSR § 2.4. See Exhibit 2(Y). Appellant-Applicant justified its waiver request by asserting that "it appears from the preliminary findings [i.e.: the October 28 DRB Decision] that our application is sufficiently complete to allow us to move to the final hearing." Id.

The DRB apparently denied Appellant-Applicant's waiver request and proceeded to review Appellant-Applicant's major subdivision and PRD applications on an intermediate level, pursuant to NSR § 2.4. The Court has been unable to ascertain what specific determinations the DRB rendered in its intermediate plan review, as the parties did not provide the Court with a copy of that DRB Decision.[5] Nonetheless, it can be determined from the parties' respective references and inferences that, by its Decision dated March 4, 2005, the DRB unanimously denied intermediate plan review approval of Appellant's subdivision and PRD applications. This appeal followed.

In its Statement of Questions, Appellant-Applicant preserved the following issues for review in this appeal:

1. Whether the proposed PRD creates a pattern and density of development which is appropriate for the site's location, character and physical capacity, pursuant to NSR § 3.1.

2. Whether the proposed PRD will have any adverse impact on the Town's scenic resources, pursuant to NSR § 3.3(I), including:

   a. the impact on scenic roads which are within view of the proposed subdivision (Subsection (1));

---

[4] See Footnote 2, above. NZR § 12.2.3 specifically provides that "Applications of PRD's shall be reviewed simultaneously with applications for major subdivision review in accordance with the requirements and procedures set forth in the Subdivision regulations."

[5] The undersigned recognizes that this appeal is a de novo proceeding and that the past practice of this Court has been to not require the parties to file a copy of the decision from which the appeal was taken. But the undersigned has found this practice to be somewhat frustrating where, as here, a certified copy of the decision below would prove to be a helpful resource when the Court is attempting to determine what was and was not decided below, solely for purposes of clarifying the procedural record.

    b.  the placement of the proposed PRD within the "middleground" of the view from scenic roads or viewsheds, so as to "avoid prominent placement within the foreground or background of the viewshed . . . ." (Subsection (2)); and

    c.  the impact upon the Village gateway, so as to reinforce the contrast between compact centers and surrounding countryside, pursuant to Subsection (3).

3.  Whether the proposed PRD should be given a waiver, as provided for in NSR § 3.3(J), from the adverse impact standards of § 3.3(I) cited above. Such waivers may be given under NSR § 3.3(J) upon a determination that the waiver or "modification would result in a more desirable settlement pattern, and impacts on identified resources can be mitigated either on or off site." Id.

4.  Whether the proposed PRD reflects the desired settlement pattern for the area in which it is located, which specifically includes the Village Residential District and the gateway to the Village, pursuant to NSR § 3.4(A)(1), including whether the proposed subdivision and PRD:

    a.  are consistent with traditional densities within the Village and gateway;[6] and

    b.  reflect the historic character of the surrounding area, including lot size, building line (i.e. front yard setbacks) and streetscape along public roads.

5.  Whether the October 28, 2004 DRB Decision on Appellant's preliminary subdivision and PRD applications (referenced above as Exhibit 3) has any precedential value in this de novo appeal.[7]

## Findings of Fact

Based upon the evidence presented at the merits hearings, the Court makes the following findings of facts:

1.    Appellant-Applicant owns the 3.95± acre parcel of land that is the subject of the subdivision and PRD applications in this appeal. This parcel fronts on the west side of Main Street, between the I-91 interchange and the Village section of Norwich (Village). Main Street runs along U.S. Route 5 as it travels in a northerly direction past Appellant-Applicant's parcel and into the Village.

2.    Appellant-Applicant's entire parcel is in the Village Residential Zoning District (Village District) and within the Village gateway, an area described in more particularity below.

---

[6] The wording of Appellant-Applicant's Questions differs slightly from the wording of NSR § 3.4(A)(1) ("desired" instead of "traditional," for example). We have tracked the language of the Regulations in our summary here.

[7] Appellant-Applicant makes reference in its Question 5 to other DRB decisions and requests for information that were not offered into evidence at trial. The Town also made an alternate request in its post-trial motion for the opportunity to offer such items into evidence. We decline to grant the Town's request and have stricken the reference to these items in Appellant-Applicant's Question 5, given that these prior decisions and requests were not offered or admitted at trial.

3.     The proposed development would subdivide the 3.95± acre parcel into two parcels: Parcel A would contain 1.84± acres and would be the site of the proposed PRD; Parcel B would contain 2.11± acres and would be maintained as conserved land.

4.     Parcel A is presently undeveloped and contains an open, level field fronting on the west side of Main Street.  On the west and south edges of the open field, the parcel is wooded and slopes downward, in some places at rather steep but short slopes.  The open field is approximately three-quarters of an acre and the wooded hillside is a little more than an acre.

5.     Parcel B is also undeveloped and continues the wooded hillside from Parcel A.  As Parcel B levels off, it is principally wetland.  Appellant-Applicant represented that it intends to maintain Parcel B as undeveloped, conservation land.  The Court notes that it specifically relies on this and other representations in making its other Findings and Conclusions.

6.     A large tract of land to the west and south of Parcel B is referred to as the Booth property and is subject to some type of conservation easements or restrictions, although not detailed at trial.  The land across Main Street from the southeast corner of Parcel A is owned by the Town, contains an old apple orchard, and is subject to conservation easements or restrictions.  There is no development on these neighboring parcels.

7.     Across Main Street from the northeast corner of Parcel A is a parcel of land similar in size to Appellant-Applicant's property which contains a large single family residence known as the Peisch House.  While the Peisch property is across Main Street from the northeast corner of the subject property, the Peisch House itself is located just north of the subject property, across from a row of large spruce trees to the north of the subject property.

8.     This row of spruces and the Peisch House mark the southerly boundary of Norwich Village, which is smaller than and completely contained within the Village Residential Zoning District.  The row of spruces and the Peisch House mark the transition from the outlying gateway (also part of the Village District) to the Village proper.

9.     This row of spruces is about 1,100 feet from the junction of U.S. Route 5 and the northern edge of the I-91 interchange.  The southeast corner of the subject property is about 600 feet from the I-91 interchange.

10.     The area between I-91, the Peisch House, and the row of spruces has been identified as a scenic resource and is referred to as the gateway into Town from the east.  It is specifically identified in the Inventory of Scenic Resources, prepared for the Town by a committee of the

Norwich Conservation Commission and dated January 2000 (Exhibit 5). The evidence at trial, supplemented by the prior site visit, leads the Court to agree with the Inventory statements that while the gateway has been compromised by the close proximity of the Interstate, the gateway serves as a pleasing introduction to the Village proper. It also serves as a transition area and buffer for the Village from the I-91 interchange and its nearby commercial developments.

11.     This gateway appears small in physical area and less significant in character when compared to gateways in many other Vermont rural communities, as reflected in Vermont's Scenic Landscapes: A Guide for Growth and Protection, published by the Vermont Agency of Natural Resources (1991), a copy of which was introduced at trial as Exhibit C. The land parcels in the Norwich gateway are too small to support agricultural practices similar to those reflected in the Scenic Landscapes Guide.[8] The Norwich gateway is mostly overgrown (See Exhibit 8, Norwich Planning Office aerial photo (2005), with boundary line overlays). Because of the short distance to the Village from the I-91 interchange, as well as the overgrowth within the gateway, it is difficult and perhaps impossible to observe from the gateway the "fine architectural detail of the building complex"[9] within the Norwich Village. With the exception of the very small, ¾± acre open field on Parcel A, the Norwich gateway does not contain the "open fields" that comprise the gateways to many of Vermont's historic villages, as reflected on pages 38–39 of the Scenic Landscapes Guide.

12.     A small strip of undeveloped land abuts Parcel A to the north. This strip of mowed land and the row of spruces mark the background of the gateway.

13.     All parcels described above (the subject parcel(s), the Booth conservation land, the Town orchard conservation land, the Peisch property, and the row of spruces) come immediately into view as one travels from the I-91 interchange towards the Village proper. The proposed structure will be clearly visible as one travels through the gateway in an approach to the Village, but will not obscure or adversely distract from the other views within the gateway. The placement of the structure in the middle of the open field of Parcel A will be a change, and therefore an "impact" upon the gateway, but will not constitute an adverse impact on the gateway, due to its design and siting.

---

[8]  See Id. at 58–59.
[9]  Id. at 39.

14. The proposed PRD is centered in the northern portion of the open field area of Parcel A. The southerly portion of this open field will remain open; a portion of this area will accommodate the primary and replacement areas for the PRD on-site waste disposal system, which has been designed as subsurface system and therefore will not interfere with the integrity of this remaining portion of this open field.

15. The structure itself has been modified from the plans originally submitted to the DRB in its preliminary review proceeding. In response to one of the recommendations from the DRB, the structure was reduced from three stories to two, with gables on its roof. The structure continues to house five townhouses, to serve as five individual residences.

16. The structure as proposed both before and after the DRB's preliminary review determination (see Exhibit 3) contains five townhouse units. It would represent the only known five-unit dwelling structure in the Village District.

17. As presented at trial, the proposed structure would be somewhat larger than the Peisch House across Main Street, but would not be substantially larger than many of the historic residences that line Main Street in the nearby Village. Its design is in keeping with the nearby Village structures; the manner in which brick and clapboard siding are used will belie its newness. As with nearby historic structures, the proposed townhouse structure is orientated to Main Street and tastefully landscaped, as shown on Exhibits 1 and 2(A) through 2(Y), inclusive. Parking and driveway accesses are located to the north and east of the structure, so as not to be immediately visible as one approaches the Village through the gateway.

18. The proposed structure as currently designed and with the Peisch House across Main Street and to the north, would provide a more recognizable and appropriate transition marker for the end of the gateway and the beginning of the Village. The row of spruces hides the view of the Village; the proposed structure on one side and the Peisch House on the other and to the north will more clearly announce that a traveler is now entering the Village.

19. The proposed structure is sited as far back from Main Street on Parcel A as practical. That parcel drops off steeply at the edge of the open field. The structure is located about 20 feet from the top of this slope, which continues onto Parcel B. As Parcel B levels off, it enters a class 3 wetland, which is as close as 25 feet from the rear driveway for the structure proposed on Parcel A. Exhibit 2(L).

20.     The proposed driveway and parking areas are located away from the front of the proposed townhouse structure, so as to soften the appearance of this proposed five-unit structure and keep it consistent with nearby residential properties.  Garages will be located within the structure and accessed from the rear.

21.     The design reinforces the characteristic of many Vermont Villages, including Norwich Village, of a more dense clustering of residences in or near village centers.

22.     Only one- and two-family residential dwellings[10] are classified as permitted structures or uses in the Village District under NZR 10.5.  The Zoning Regulations also provide, however, that "PRDs are encouraged in [two] designated districts," one of which is the Village District. NZR § 12.1.  There are a total of six zoning districts in Norwich.

23.     Appellant-Applicant previously obtained a permit to construct a two-family dwelling on the subject property.  The specific design of this structure was not introduced at trial, but it was uncontested that the permitted two-family dwelling would be similar in size to the proposed five unit townhouse.  This permit evidences that development is permitted in the gateway in general and on this parcel in particular, including at the size and scale of the proposed townhouse.

## Legal Analysis

Most appeals to this Court require de novo proceedings.  The same is true of this appeal. But this procedural fact does not automatically mean that this Court is charged with hearing the entire application anew.  We are jurisdictionally limited to only hear those aspects of the decision below that the appellant has properly preserved for review.  In re Garen, 174 Vt. 151, 156 (2002), citing Village of Woodstock v. Bahramian, 160 Vt. 417, 424 (1993).

Appellant here has presented issues in its Statement of Questions that appear to cover the gamut of issues that could have been raised in an application for intermediate plan review under NSR § 2.4.  As noted above, we do not have a copy of the decision appealed from, and therefore cannot readily determine if Appellant's Statement of Questions left untouched any determinations in the appealed-from decision.  Nonetheless, we are mindful of the jurisdictional limitations noted in Garen and Bahramian and intend to respect them.  We therefore will review the legal issues before us by citing to the numbering system in Appellant's Statement of Questions.

---

[10]  Other types of structures and uses are permitted in the Village District, but are not pertinent to the pending applications.

**1.     Appropriateness of development's pattern and density.**

This PRD is somewhat unique because it contains only one building, albeit with five dwellings. PRD's often contain many more dwellings in multiple structures. A PRD of greater size than the subject PRD can often have a significant impact on the pattern and density of the surrounding neighborhood. The subject PRD will not. In fact, the proposed five-unit townhouse, while it may be unique to the Village district, is appropriate for the site's location, character and physical capacity. Its design is in harmony with the Peisch House across Main Street and will complement the latter as a proper transition marker from the gateway to the Village. The subject lot is similar in size to the Peisch property and many of the neighboring lots in the Village District. Its size and location on Parcel A is similar to the historic homes in the immediate vicinity. We therefore find that the proposed development creates and maintains a pattern and density that is appropriate for the site's location, character and physical capacity.

**2.     Adverse impact on scenic resources.**

The proposed PRD will have an impact upon a recognized scenic resource: the gateway. It will convert at least half of an open field into a residential development. However, due to its design and siting, the impact will not be adverse and therefore will not violate NRS § 3.3(I).

The gateway into Norwich appears to have suffered from two compromising events. The first is the extension of I-91 through Norwich. Testimony at trial revealed that what once may have been a majestic gateway of agricultural lands, much like those referenced in the Scenic Landscapes Guide, is no more. The edge of the interstate marks the southerly edge of the present gateway. The I-91 interchange is only 600 feet from the subject property; using the scale on Exhibit 8, it appears that the gateway is no more than 1,100 feet long—one approaches and exits the current gateway in a matter of seconds, not minutes.

The second compromising event is a bit more recent, it appears: the parcels within and surrounding the gateway, due to their size, have lost their ability to support agricultural activity and have become overgrown. The aerial photo shown in Exhibit 8 shows an area that is mostly wooded or overgrown. The pre-trial site visit and testimony at trial reinforced this current fact. Its consequence is that, while the gateway still exists, it acts more as a visual barrier than an introduction to the Village. It does not serve as the invitation into the Village that is explained in the Scenic Landscapes Guide at pages 38–39.

Nonetheless, the current gateway serves as a beneficial buffer and transition point from the commercial development near the I-91 interchange and the Village center, which remains one of the truly beautiful villages in Vermont. In fact, one could conclude (although not necessary to the decision here) that the proposed development, with the Peisch property opposite it, will serve to improve the distinctive character of the end of the gateway. Well designed homes, one historic and the other designed to respect the historic character of homes nearby, will stand guard at the edge of the Village where now there is a line of spruce trees that does not reveal to the new traveler what lies ahead. The proposed development will help reinforce the contrast between the commercial area around I-91 and the historic Village center.

Because of the overgrowth in the gateway and the placement of the proposed development, a traveler leaving the Village and traveling south may pass the proposed development with little notice. One approaching the Village from the I-91 interchange will mostly see the conserved lands of the Booth property and the old apple orchard. The proposed development will come into view before the Peisch House, but will serve as a balance to the Peisch House, marking the conclusion of the gateway and beginning of the Village. The view one enjoys while traveling through the gateway will not be compromised by this development.

### 3. Waiver from § 3.3(I) standards.

In light of our legal conclusions on the impact to scenic resources, we see no need to analyze whether a waiver of them is warranted under NSR § 3.3(I). Because we determined that that there is no adverse impact on scenic resources, the development needs no waiver from the requirements of this provision.

### 4. Desired settlement pattern.

The Town has announced that "PRD's are encouraged in designated districts" for the multiple purposes of (1) encouraging design flexibility; (2) increasing density and facilitating the use of established streets and utilities in a cost effective manner; (3) clustering development to encourage the preservation of farmland, forest and wildlife habitat; (4) accommodating new development in a manner that maintains the Town's historic settlement patters; and (5) providing for diversified housing types. NZR § 12.1. The proposed development is not in conflict with any of these stated objectives. In fact, it helps work towards these stated goals.

The proposed subdivision establishes lots that are similar in size to other nearby lots, including the Peisch property and nearby Village lots. Parcel B will be maintained as

conservation land, much like the properties that surround it.  The design of the proposed townhouse structure respects the historic character of nearby residences, while also providing the diversity of housing the zoning regulations speak to, but which is apparently lacking in Norwich.

This development reflects the settlement patterns represented in the zoning district in which it lies.  The Village District permits one- and two-family dwellings without regard to the historic compromises that they may bring to the area.  The proposed project is in keeping with the gateway, the Village, and the other areas within the Village District.  We therefore conclude that the proposed project reflects the desired settlement patterns for its area, as articulated in the municipal regulations.

**5.      Finality of preliminary determinations.**

As we noted above, preliminary determinations that are not successfully appealed from provide for finality on certain legal determinations properly made at that stage of the subdivision review proceeding.  See Tekram Partners and Gulli, supra.  The remaining question concerns identifying what constitutes a final determination within a preliminary subdivision determination.

As also noted above, no one asserts that preliminary approvals constitute final approval. The regulations provide clear notice that preliminary approval "shall not" constitute final approval.  NSR § 2.4(E).  Yet even the Town concedes that there are some preliminary determinations—if unappealed from—that are deemed final, such as determinations on waiver requests and whether a subdivision application should be processed as a "major" or "minor" application.  But a close examination of the DRB's preliminary determination shows more.  In particular, the DRB's October 28, 2004, preliminary plan review determination (Exhibit 3) provided in its Conclusions of Law that the "development of dwelling(s) on the 1.84 acre parcel is consistent with the applicable Subdivision Regulations."  Id. at 3, ¶3.  The DRB continued with the following conclusion:

5. As a preliminary determination and subject to the recommended changes, requests for further documentation and potential conditions [contained within the DRB Decision], the proposed subdivision plan generally conforms to applicable subdivision review standards under [NSR] Article 3, and with other municipal regulations currently in effect.

Id.

Nothing in the October 28 DRB Decision constitutes final approval of Appellant-Applicant's subdivision or PRD. However, these preliminary determinations, left unchallenged, establish finality on one basic component of the proposed project that cannot be challenged in this proceeding: that the Town regulations do not establish an absolute bar to development on Parcel A, including the general notion of siting a five unit townhouse on the property. Had Appellant-Applicant refused to address the DRB's "recommended changes, requests for further documentation and potential conditions," or designed a project which was not in harmony with the Village and its gateway, this project risked denial at the intermediate stage of development review under NSR § 2.4. But under our analysis, the unappealed prior determination brings some finality, particularly on the general question of whether the municipal regulations bar any development in the gateway, and whether those same regulations prohibit five-unit townhouse developments in general. To the extent that the Town's objections are based upon these general contentions, we conclude that the Town cannot now put forth protests against gateway development in general or five-unit townhouse developments in particular.

Finality of preliminary determinations works against applicants as well and there is an example of such finality here. Appellant-Applicant first requested a waiver from intermediate plan review from the DRB, which denied this waiver request. See Exhibit 3, at 3. Appellant-Applicant did not appeal that determination, but rather renewed its waiver request when it submitted its revised plans. See Exhibit 2(Y). The DRB apparently again denied the waiver request by its Decision of March 4, 2005. Appellant-Applicant did not raise the waiver issue in its Statement of Questions and therefore did not preserve the waiver issue for our review in this appeal. Thus, the proposed project must still obtain final plan review approval from the DRB.

## Conclusion

For all the foregoing reasons, we **VACATE** the March 4, 2005 decision of the Norwich Development Review Board and hereby **GRANT** intermediate subdivision and PRD approval to Appellant-Applicant's proposed project, subject to the following conditions:

1. No subdivision or development of the subject property shall occur unless and until the project receives final plan approval pursuant to NSR § 2.5 and Appellant-Applicant satisfies the recording requirements of NSR § 2.7.

2. The subdivision shall be completed as shown on the project plans offered into evidence in this proceeding.

3.  The townhouse structure shall be constructed as shown on the final drawings approved by the DRB in its final plan review under NSR § 2.5.

4.  Neither Parcel A nor Parcel B shall be further subdivided.  Parcel B (the 2.11± acre parcel) shall be subject to a conservation easement that prohibits further development. The Zoning Administrator shall not issue a building permit until he receives satisfactory evidence that the aforesaid restrictions are set forth in a document to be recorded in the Norwich Land Records.  Such conservation easement shall run with the land and be binding upon Appellant-Applicant's successors and assigns.

5.  The Zoning Administrator shall not issue a building permit until Appellant-Applicant grants the Town an easement for the pedestrian access reflected in its current plans.

Done at Berlin, Vermont this 27th day of June, 2006.

_____
Thomas S. Durkin, Environmental Judge