# In re Stowe Club Highlands

[668 A.2d 1271]

No. 94-322

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed September 22, 1995

Motion for Reargument Denied October 26, 1995

*Harold B. Stevens*, Stowe, for Appellant.

*Leighton C. Detora*, pro se, Barre, Appellee.

**Dooley, J.** Stowe Club Highlands (SCH), successor in interest to Robinson Springs Corporation (RSC), and owner of a real estate development in Stowe,[1] appeals from a decision of the Lamoille Superior Court which denied a subdivision permit to develop twenty-two acres for a single-family house. The superior court decision was reached in an appeal from the Stowe Planning Commission brought by an adjoining landowner within the development, Leighton Detora.[2] SCH argues that the superior court erred in ruling that the proposed permit is (1) prohibited by the applicable setback requirement of the Stowe zoning ordinance, and (2) that the area in which the house would be developed has been irrevocably dedicated as open space. Although we agree that SCH's second argument is correct, we affirm the decision of the trial court based on the prohibition on constructing the house within the setback area.

The area in issue is a small part of a larger development, originally proposed by Nolex, Inc. on a 235-acre parcel called the Stowe Club property. Although the mix has changed over time, the development plan has included a hotel, single-family lots and townhouses. The original proposal received conditional use approval from the Stowe zoning board and site-plan approval from the planning commission, as well as an Act 250 permit from the district environmental commission. While owned by Stowe Club Associates, after purchase from Nolex, Inc., it received partial subdivision approval to enable sale of twenty

---

[1]The case was litigated below by Robinson Springs Corporation, and Stowe Club Highlands was substituted in this Court. To avoid confusion, we have referred to the litigant below as SCH.

[2]The Town of Stowe and another adjoining landowner were originally parties in the superior court, but they did not actively participate in that court and did not file briefs here.

single-family lots. One of these lots was purchased by Leighton Detora from Chittenden Trust Company, which took the development from Stowe Club Associates. The current controversy arose when RSC purchased the development property, excluding single-family lots which had already been sold, and started to pursue seriously new permits to complete the development. These included subdivision permits from the planning commission, covering all of the property and uses, and a new conditional use permit from the zoning board to reflect the modifications in the proposal.

The Stowe Club property lies within an agricultural and rural residential zoning district. The district normally allows residential developments only on large lots but authorizes, as a conditional use, a resort planned unit development (PUD), subject to specific conditions in the zoning ordinance. The Stowe Club development has been treated as a PUD and received conditional use permits on that basis.

This case involves only a small part of the development, a twenty-two acre meadow in the northeast corner of the Stowe Club property. Detora's property abuts this meadow. The meadow contains a barn, with a mobile home in it, which was in existence when the original permits were obtained by Nolex, Inc. Although there was discussion of using the barn as a riding stable, it has apparently been unused at least since 1982 when the Nolex, Inc. development was originally proposed. At its nearest point, the barn is approximately seventy-five feet from the boundary line with the northern neighbor.

From the first permit, the meadow was to be dedicated to agricultural use, as well as to contain a septic field. None of the conditions for the many Stowe permits states this explicitly although this intention is contained in the minutes of meetings and in findings. It is stated explicitly in the Act 250 permit. There is very little mention of the barn in any of the proceedings.

The official "boundary plan" on which the subdivision permits are based shows a 200-foot "green belt" surrounding the Stowe Club development on the outer edges of the property, and this "green belt" goes around the eastern and northern portions of the meadow. The barn lies within the green belt.

This case arose when RSC proposed to subdivide out the meadow as a single-family lot and to build a house and stable in the footprint of the barn. Detora objected, arguing that the meadow had been reserved as open space and a house could not be built on the barn site because it lies within a 200-foot nonwaivable setback from the line with the northern neighbor. The planning commission rejected these

arguments and approved the subdivision, and this action was followed by conditional use approval by the zoning board of the lot as subdivided.[3] On appeal, the superior court accepted both of Detora's arguments and reversed the grant of the subdivision permit.

Our review of the issues raised by SCH is complicated by the way the case was approached by the superior court. On appeal from a planning commission decision, the court must conduct a de novo trial. See 24 V.S.A. §§ 4472(a), 4475. This standard requires the court to approach the case as if it were the planning commission, without regard to what had been done before by the planning commission. See *Chioffi v. Winooski Zoning Bd.*, 151 Vt. 9, 11, 556 A.2d 103, 104–05 (1989); *In re Poole*, 136 Vt. 242, 245, 388 A.2d 422, 424 (1978). In the present case, the court failed to evaluate the case according to this standard. Although the court gave Detora a de novo trial on the issues, it addressed only the arguments that the subdivision permit was unlawful because of the prior dedication of the meadow land as open space and the setback requirements in the zoning ordinance.

The effect of the superior court's approach is that it incompletely evaluated the case. Because it ruled that the planning commission could not lawfully grant the disputed permit, the error is harmless if we agree with the court's result. If we conclude that the court erred, however, we must remand for the superior court to evaluate the permit application as if it were the planning commission.

## I

We begin by analyzing the superior court's holding that the meadow has been dedicated as open space. The court based its holding on (1) a provision of the Stowe zoning ordinance reserving certain land as "open space"; and (2) a "boundary plan," recorded as part of the subdivision approval, which designates the meadow as an "agricultural easement." We find that neither reason supports the court's holding.

The court concluded that the meadow was reserved for public use, relying upon a section of the PUD provisions of the zoning ordinance which states:

(2) Land which is not included in building lots, streets, rights-of-way, or utility easements, shall be reserved as open

---

[3] The conditional use permit was not appealed and is not before us. Because Detora used his applicable appeal routes, the case was properly before the superior court. See *Wright v. Preseault*, 131 Vt. 403, 407–08, 306 A.2d 673, 677 (1973).

space for recreation, conservation, agriculture and the en-
hancement of the natural environment for living.

Stowe Zoning Ordinance § 12.5(2). In essence, the court ruled that
the reservation for public use had become an implied condition of the
subdivision permit.

In the related context of zoning permit requirements, we recently
addressed the issue of whether representations by a landowner, and
findings of fact of a zoning board, represent implied permit conditions
even though not expressed as explicit conditions of the zoning permit
issued by the board. Deciding that enforcement of implied conditions
would "impose a difficult if not impossible burden on interested
parties to determine applicable regulatory standards," we held that
"[c]onditions that are not stated on the permit may not be imposed on
the permittee." *In re Kostenblatt*, 161 Vt. 292, 299, 640 A.2d 39, 44
(1994).

*Kostenblatt* distinguished between discretionary permit conditions
and minimum requirements for specific land uses within the district
involved. The former must be stated explicitly, but the latter are legal
requirements with which the landowner must comply. Thus, there is
no requirement that the zoning board explicitly state that the
landowner must comply with the law or detail all the applicable legal
requirements. *Id.* at 300, 640 A.2d at 44.

 We see no reason for purposes of the *Kostenblatt* holding to
distinguish between zoning and subdivision permits. Indeed, part of
the purpose of a planned unit development is to merge zoning and
subdivision requirements. See 24 V.S.A. § 4407(12) (modification of
zoning regulations by planning commission may be permitted simul-
taneously with approval of subdivision plat); cf. *In re Robinson*, 156
Vt. 199, 201, 591 A.2d 61, 62 (1991) (reviewing compliance with zoning
ordinance through appeal of subdivision permit). We note, however,
that the function of a subdivision permit is to approve "plats of land,"
24 V.S.A. §§ 4401(b)(2), 4415, and such plats must be "duly filed or
recorded in the office of the clerk of the municipality." *Id.* § 4416.
Thus, although we will not recognize implied permit conditions as
subdivision permits, recorded plats necessarily become subdivision
permit conditions.

 We do not believe designation of the meadow for public use
existed as an enforceable permit condition. None of the many permits
granted by the zoning board or planning commission conditioned
approval on the dedication of the meadow as open space. The only plat

filed was the boundary plan, which was intentionally incomplete to allow for the development of the single-family residential lots, the only subject of the partial subdivision approval. The map divides large parcels of the overall development for the obvious purpose of leaving the specific description of their development to future proposals. The general outline of these future development proposals had already been presented to the zoning board and planning commission for conditional use and subdivision approval.

We also do not believe that the ordinance provision, set forth above, created a minimum legal requirement that was enforceable even without a specific permit condition. The proposal submitted, and the plat approved, clearly left the use of most of the Stowe Club land unspecified because it would be subject to future proposals. Under the trial court's theory, all of the remaining land, including that intended for placement of the hotel and the townhouses, became dedicated to public use as a matter of law. This represents an unreasonable application of the zoning law.

We are left, then, with the argument that the cryptic description of the meadow as an "agricultural easement" must be read as a condition that the land be dedicated to public use and that the barn be torn down with nothing to replace it. We conclude that this argument reads far too much into a two-word description on a map unaccompanied by permit conditions and in an area not part of the partial development proposal submitted.

## II.

The second ground for the trial court's action is that a 200 foot setback requirement applied to the overall Stowe Club development and this requirement could not be waived by the planning commission. Because the proposed house was to be placed within the setback area, the court found that the setback requirement prohibited its construction. It further concluded that the house was not allowed as the continuation of a lawful, nonconforming structure.

On appeal, SCH argues that there was no 200 foot setback requirement, but instead a "green belt" requirement that could be waived. This argument was not raised below; in fact, SCH constantly referred to the requirement as a "green belt or setback area."[4] This

---

[4] SCH recognizes it has shifted position on appeal. In its brief, it acknowledges that it stipulated that a 200 foot setback was applicable.

was consistent with the understanding of the Stowe zoning administrator and the planning commission, which consistently called the 200 foot distance a setback. See *In re Duncan*, 155 Vt. 402, 408, 584 A.2d 1140, 1144 (1990) (court gives deference to interpretation of zoning ordinance by local administrative body). In any event, the failure to raise the issue below precludes its consideration here. See *In re Kostenblatt*, 161 Vt. at 301–02, 640 A.2d at 45.

We have also examined the ordinance provisions on which the court relied to reach its conclusion that a 200 foot setback existed and was nonwaivable. We conclude that the court properly construed those ordinance provisions.

SCH argued below that because the barn was a noncomplying structure, and not otherwise a nonconforming use, it could be replaced with a house and attached stable within its footprint. Relying on the policy of phasing out nonconforming uses, including noncomplying structures, the superior court rejected this argument: "having found that the proposal by Robinson Springs seeks to substantially alter the building, in that the unused barn will be replaced with a new residential dwelling, and that such a use of the property is replacing one non-complying use with another." On the other hand, Detora specifically argues here that the ordinance does not allow for the total replacement of one noncomplying structure with another.

■ Although nonconforming uses and noncomplying structures are generally inconsistent with the purposes of land use planning and zoning, see 24 V.S.A. § 4302(a) (purpose of Vermont Planning and Development Act is to "provide means and methods for the municipalities and regions of this state to plan for the prevention, minimization and future elimination of such land development problems as may presently exist"), the approach of the Legislature has been to authorize municipalities to "regulate and prohibit expansion and undue perpetuation of nonconforming uses," *id.* § 4408(b), but not to command any particular action. The statute defines a noncomplying structure as a nonconforming use, but the definitions in the Stowe zoning ordinance carefully differentiate these concepts. Under these definitions, a noncomplying building is not a nonconforming use. *Id.* §§ 2(33), 2(34).

■ We emphasize that the issue here involves a noncomplying structure, and not a nonconforming use, because the nonconformity is caused by a violation of setback requirements and not a land use

impermissible in the zone involved.[5] See *id.* § 4408(a)(2). Thus, we must be mindful of the distinction between noncomplying structures and nonconforming uses, and carefully analyze the Stowe ordinance to determine how it specifically treats and regulates noncomplying structures. At best, however, we find the Stowe ordinance confusing with respect to noncomplying structures. SCH relies on a portion of the ordinance, which provides:

> Any non-conforming building which was designed, arranged, intended for, or devoted to a non-conforming use may be reconstructed and structurally altered, and the non-conforming use therein changed, subject to the following regulations:

Stowe Zoning Ordinance § 5.1. Detora points to § 5.2 of the ordinance, which deals with noncomplying structures as follows:

> A building which does not comply with the requirements of this Bylaw shall not be enlarged or substantially altered, unless such enlarged or altered portion complies with the regulations. . .
>
> . . . .
>
> (2) Any expansion or alteration that does not comply with established setback requirements but does not compound the existing situation shall meet the requirements specified in Sections 5.1(3)(A) and 5.1(3)(B) as they apply to the building. In no case shall such an expansion or alteration cause the aggregate gross floor space of all such expansions and alterations to exceed 50% of the floor space contained in the noncomplying portion of the building at the time of the adoption of this bylaw subsection. . . .

*Id.* § 5.2(2).

We use familiar rules of construction in interpreting zoning ordinances. We first construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance.

---

[5] The trial court described the issue as one of a nonconforming use, which is technically accurate under Vermont statute. See 24 V.S.A. § 4408(a)(1). There is no question that both the barn and the proposed house are authorized or conditionally authorized uses in the agricultural and rural residential district in which the land lies. Therefore, they are authorized or conditionally authorized uses for the PUD within this zone, see Stowe Zoning Ordinance § 13.2(2), and there is no nonconforming use problem apart from the violation of the setback requirement.

*In re Vermont Nat'l Bank*, 157 Vt. 306, 312, 597 A.2d 317, 320 (1991). If there is no plain meaning, we attempt to discern the intent from other sources without being limited by an "isolated sentence." *Williston Citizens for Responsible Growth v. Maple Tree Place Assocs.*, 156 Vt. 560, 563, 593 A.2d 469, 470 (1991). We uphold the trial court construction unless it is clearly erroneous, arbitrary or capricious. *In re Vermont Nat'l Bank*, 157 Vt. at 312, 597 A.2d at 320.

In this case, it is impossible to determine the intent of the drafters from the plain meaning of the words used, as applied to the situation before us. The difficulty centers on whether the ordinance authorizes the replacement of a noncomplying structure, and if authorization exists, the conditions applicable to such a replacement. SCH points to § 5.1 of the ordinance, which does authorize reconstruction but only for a building "designed, arranged, intended for, or devoted to a non-conforming use." As discussed above, the barn was a conforming use.[6]

Section 5.2 appears to be more on point, but that section is drafted as a prohibition and fails to mention reconstruction or replacement. Contrary to Detora's argument, the logical result of the omission is that reconstruction or replacement is allowed, without regulation, while enlargement or substantial alteration are prohibited except under certain circumstances. We could avoid this result by holding that substantial alteration includes total replacement,[7] but the last sentence of § 5.2(2) would appear to limit replacement to a building half the size of the original. Neither of these results is rational.

█ In discerning the intent behind the ordinance, we rely primarily on § 5.1, but for the opposite conclusion to that suggested by SCH. This section contains the only language specifically authorizing reconstruction, but under circumstances not applicable here. We infer

---

[6] This is more than a technical drafting deficiency because the section goes on to establish various conditions under which the reconstructed or structurally altered building may be authorized. All the conditions relate to the use of the structure in relation to the requirements of the ordinance. If we apply the section, without regard to whether the use is nonconforming, the result is that reconstruction or structural alteration of a noncomplying structure is allowed with no regulation, while enlargement or substantial alteration is specifically regulated by § 5.2. That result is irrational.

[7] Alteration is defined in the ordinance to include "exterior structural change." In context, the definition might be broad enough to include replacement. See *Goodrich v. Selligman*, 183 S.W.2d 625, 627 (Ky. 1944) (structural alteration includes changing old building in such a way as to convert it to new structure); *Mossman v. City of Columbus*, 449 N.W.2d 214, 219 (Neb. 1989)(substitution of one mobile home for another is structural alteration). However, § 5.1 appears to separate out reconstruction from structural alteration.

that the drafters intended to prohibit reconstruction in any other circumstance, see *City & County of Denver v. Board of Adjustment*, 505 P.2d 44, 46 (Colo. Ct. App. 1972) (explicit right to change nonconforming use does not give rise to an implied right to change nonconforming structure where ordinance clearly distinguishes between nonconforming use and nonconforming structure), and that § 5.2 applies only to expansion or alteration, which does not include reconstruction or replacement. See *Gannett Outdoor Co. v. City of Mesa*, 768 P.2d 191, 196 (Ariz. Ct. App. 1989) (replacement of billboard with another one is not alteration under local zoning ordinance); *Gagne v. Inhabitants of Lewiston*, 281 A.2d 579, 582 (Me. 1971) (ordinance that allows noncomplying structure to be enlarged or altered does not permit demolition of existing building and replacement with another); *Angus v. Miller*, 363 N.E.2d 1349, 1352 (Mass. App. Ct. 1977) (authorization to enlarge noncomplying structure does not include power to raze existing building and construct new one). Thus, we conclude that SCH is not authorized to totally replace a building lying within the setback area. This result is consistent with the state's policy against the "undue perpetuation of nonconforming uses." 24 V.S.A. § 4408(b); see *Hinsdale v. Village of Essex Jct.*, 153 Vt. 618, 626, 572 A.2d 925, 929 (1990). We affirm the trial court decision on this ground.

Because this result may not totally end this controversy since it prohibits building the house and stable only in the setback area, we reiterate that we have ruled only on whether SCH could lawfully complete its development plans for the meadow. In any future proceedings, the superior court must act as the planning commission and exercise its discretion on whether the requested subdivision is appropriate under the circumstances.

*Affirmed.*