**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

| | } | |
|---|---|---|
| Northern Acres, L.L.C. | } | Docket No. 116-6-05 Vtec |
| | } | |
| | } | |

## Decision on Cross-Motions for Summary Judgment

Northern Acres, L.L.C. appealed from a decision of the Town of Swanton (Town) Planning Commission dated June 14, 2005, denying its sketch plan request to expand an existing four-lot planned residential development (PRD) located at 16 Green Acres, westerly of the Middle Road, in the Town's R3 Moderate Density Residential Zoning District. Appellant-Applicant seeks to further subdivide land previously designated as "Common Land" to add four new residential lots. Appellant-Applicant is represented by Paul S. Gillies, Esq., and the Town is represented by Joseph F. Cahill, Jr., Esq. Now pending before the Court are the parties' cross-motions for summary judgment.

## Factual Background

The parties represent that the material facts are not in dispute. Those facts material to the resolution of the pending motions areas follow:

1. Appellant-Applicant Northern Acres, L.L.C. is the successor in interest to RLP, Inc., which in turn was the successor in interest to Chad and Mary Metayer.

2. On June 25, 1997, the Town of Swanton Planning Commission granted final plat approval to Chad Metayer for a four-lot major subdivision/PRD located westerly of the Middle Road, in the Town's R3 Moderate Density Residential Zoning District.

3. Subsequent to the Planning Commission's final plat approval of the PRD in 1997, the Metayers conveyed the four residential lots and the common land (that is, the entire PRD approved in 1997), to RLP Inc., by a deed dated October 15, 1998 and recorded in Book 151, Pages 244—249 of the Swanton Land Records. That deed referred to a survey prepared by Brooks Land Surveying, Inc., entitled "Planned Residential Development, Chad Metayer." The survey is dated February 14, 1997, but was revised on October 12, 1998 to show a septic easement along the northerly side of residential Lots 2 and 4, and lot line adjustments on two lots

*1*

beyond the boundaries of the PRD. This survey appears to also be the final plat approved in 1997. The approved final plat shows a development consisting of four residential lots arranged in a square, and an 11.33 acre parcel of land to the west and north of the residential lots. The approved final plat became part of the permit issued to Metayer and was recorded on December 31, 1998 in the Land Records at Map Slide #50 (Exhibits G and H).

4. The 11.33 acre parcel is clearly marked and designated on the recorded plat as "COMMON LAND."

5. At the June 25, 1997 Planning Commission meeting, it "was discussed" that the 11.33 acre Common Land would have "no buildings or permanent structures."

6. The Common Land, and each residential lot within the PRD, is subject to a number of restrictions set forth in a document entitled "Middle Road Homeowner's Association Declaration of Covenants, Restrictions and Conditions" (Declaration) dated October 15, 1998 and recorded in the Land Records on October 16, 1998 (Exhibit I).

7. The Declaration states, in Article VII, that "RLP, Inc. shall have the primary and exclusive jurisdiction to interpret, administer, and enforce these covenants. . . . That upon formation of the MIDDLE ROAD HOMEOWNER'S ASSOCIATION, the newly formed association shall assume the function of interpretation, administration, and enforcement of the foregoing covenants." No specific mention is made in the Declaration of any procedure for amending or revising the covenants.

8. The four residential lots were conveyed, each to a separate owner, by separate recorded deeds in 1999. Each deed states that the property is subject to the covenants, restrictions, and conditions contained in the Declaration (Exhibits J, K, L, and M).

9. On November 17, 1999, RLP, Inc. executed a document transferring "ownership"[1] of an entity called the "Middle Road Landowner's Association" to Northern Acres, L.L.C. This document was not recorded. The document states that the "Middle Road Landowner's Association" owns and oversees the "Middle Road Homeowner's Association," and purports to give the Landowner's Association the power to "revise as it sees fit . . . per ARTICLE VII" some undetermined thing, presumably the covenants, restrictions, and conditions contained in the Declaration. The document also refers to the 11.33 acre parcel as "so-called

---

[1] "Ownership" is a term not often associated in this context with an owners' association. The more accurate and familiar term used is "control." Nonetheless, we use the term cited from Exhibit N.

'Common Land'" and contemplates a "Phase II" expansion of the PRD, upon the completion of which control would be turned over to the "Middle Road Homeowner's Association" and the "Middle Road Landowner's Association" would be terminated (Exhibit N).

10. On December 30, 2003, Northern Acres, L.L.C. (c/o Chad Metayer) submitted an application to the Planning Commission for sketch plan approval for further subdivision of the previously approved PRD to create four additional lots on a portion of the 11.33 acre parcel described as Common Land on the 1997 approved final plat, and to extend the existing right-of-way onto the 11.33 acre parcel to service the proposed lots (Exhibit P).

11. The Planning Commission denied the December 30, 2003 application on March 17, 2004. Northern Acres, L.L.C. appealed that denial to this Court in May of 2004 (Docket No. 77-5-04 Vtec). The appealed sketch plan application was thereafter remanded to the Planning Commission on October 28, 2004, pursuant to the parties' stipulation.

12. On May 18, 2005, the Planning Commission held a public hearing on the remanded application. The minutes of the May 18 hearing were provided to this Court as Exhibit A. At the May 18 hearing, Commission member Joel Clark "inquired if anything had changed in the plan since it was presented . . . in March of 2004." Chad Metayer, as applicant, part owner and representative of Northern Acres, L.L.C., and Rodney Pelkey, as part owner of Northern Acres, L.L.C. and spokesman for the application, responded that "there were no changes in the plan."

13. At the May 18 hearing, the Planning Commission denied Appellant-Applicant's application for sketch plan approval to amend the previously approved PRD.

14. The Planning Commission's denial of Appellant-Applicant' application was referenced in the May 18 Minutes and communicated to Appellant-Applicant by letter from the Zoning Administrator dated June 14, 2005 (Exhibit B). This appeal followed.

## Discussion

Appellant-Applicant claims it has the "full power and authority to amend the declaration." Appellant-Applicant's Cross-Motion at 3. Mr. Metayer, as Appellant-Applicant's representative, has expressed an intention to do so at some unspecified time in the future, so that the restrictions on development of the "former" Common Land are eliminated.

This Court has no authority to interpret or rule upon private covenants or contracts, and we shall not do so here. However, even if we assume that Appellant-Applicant does have the power to amend the covenants, there is no evidence that it has yet exercised this power.

The power to amend the covenants does not equal authority to amend the permit. Appellant-Applicant attempts to conflate its proposed amendment to the PRD project with a planned (but not yet accomplished) amendment to the covenants, stating that "[i]t is not Swanton's duty to approve the amendment of the declaration. Swanton, and its successor for purposes of reviewing this application the Environmental Court, must take the amendment as it appears. It should have ruled on it as it does any other application for amendment." Id.

Appellant-Applicant misstates the substantive issue that was before the Planning Commission and is now before this Court. The pending application was not to amend the covenants, but to amend the "previously approved PRD project with creation of four additional lots by extending existing right of way." See copy of the application, submitted as Exhibit P. If the covenants provided to the Planning Commission in 1997 prohibited further development of the 11.33 acre parcel, it is premature to request the Planning Commission to authorize further subdivision while those same restrictions remain of record.[2]

We note that amending the covenants may not be as easy as Appellant-Applicant suggests, especially if the owners of the four residential lots do not agree that such an amendment is desirable. But the ease with which this revision is accomplished is not the issue here. The substantive issue here is whether Appellant-Applicant has established that it has the authority to develop the subject property at this time. The only evidence before us specifically evidences a prohibition against development.

We have consistently stated that an applicant must meet a threshold burden of evidencing that it has the authority to conduct the development that its application proposes. See Clermont Terrace Site Plan and Zoning Permit Approvals (Appeal of Curtis), Docket Nos. 46-2-05 Vtec and 72-4-05 Vtec (Vt. Envtl. Ct., March 20, 2006), slip op. at 6 ("[I]t is Applicants' burden to show that they have title or some other authority to develop the subject property as proposed.") (citations omitted). Here, Appellant-Applicant has not only failed to meet this evidentiary burden, but has, in fact, provided evidence that there presently exists an express prohibition

---

[2] The Court does not intend to suggest here that a mere revision to the Declaration would automatically lead to approval of the amendment application now under appeal. In fact, we intend by the discussion below to speak to the ability to approve the requested amendment, even if the Declaration had already been revised as Appellant suggests.

against the development suggested in its application.  To allow Appellant's application to go forward would be little different than to allow an application to proceed that proposes to develop a property for which the applicant has no present ownership interest or authority.  We know of no such authority and decline to establish it here.

Appellant-Applicant argues that in 1997 the Planning Commission approved the subdivision "without conditions, and not subject to the declaration" and that therefore "there are no conditions prohibiting further development of the common land."  Appellant-Applicant's Cross-Motion at 2.  We disagree.  The June 25, 1997 decision of the Planning Commission (the 1997 Decision) was an approval of a final plat submitted by Appellant-Applicant.  That approved, recorded final plat (as amended in 1998) clearly shows an 11.33 acre parcel bearing the following label:

*COMMON LAND*
*TO BE CONVEYED TO*
*MIDDLE ROAD HOMEOWNER'S ASSOCIATION*
*493,754 sq. ft.*
*11.33 acres*
*(includes 0.62 acres of the 50' right of way)*
*(refer to Homeowner's Association Regulations for details of restrictions and uses)*

There is evidence that the Planning Commission relied on Appellant-Applicant's representations, both verbal and as appearing on the approved, recorded final plat.  These relied-upon representations included that the 11.33 acre area labeled "COMMON LAND" would be preserved for the benefit of the four residential lots, and would have no buildings or permanent structures, but rather be preserved as agricultural and recreational land, all as noted in the Declaration referenced on the approved plat.[3]

The proposal approved in 1997 was for a major subdivision/PRD.  Our Supreme Court noted in In re Stowe Club Highlands, 164 Vt. 272 (1995), that "the function of a subdivision permit is to approve plats of land." Id. at 276.  The Court continued to express a conclusion that is particularly relevant here when it stated that "recorded plats necessarily become permit conditions." Id. (internal quotation and citations omitted).

---

[3]  The approved plat references "Homeowner's Association Regulations."  Exhibit G.  We understand this was meant to reference the "Middle Road Homeowner's Association Declaration of Covenants, Restrictions and Conditions."  Exhibit I.

The June 25, 1997 Minutes evidence that the Planning Commission, in approving the final plat submitted by Appellant-Applicant, relied upon the plat as submitted. The restriction on further development, referenced in the approved and recorded final plat, is a condition of the 1997 permit. That condition may not be altered in the absence of changed conditions.

As this Court noted in In re Appeal of Hildebrand, Docket No. 228-12-04 Vtec, "the permit process should incorporate enough flexibility to handle changes in circumstance." Id. at 6. Here, however, there is no evidence of any changes in regulatory or factual circumstances to warrant a permit amendment. Moreover, as in Hildebrand, it was entirely foreseeable in 1997 to both the Planning Commission and Mr. Metayer that a future landowner might wish to further subdivide the protected parcel.

The undisputed record here is that Mr. Metayer represented in 1997 that this parcel would be preserved as undeveloped common land. The Planning Commission noted this representation in its Minutes and relied upon it in approving the 1997 subdivision plat. One might wish to speculate whether the Planning Commission would have approved the subdivision in 1997 if the common land representation had not been offered. But such a focus would be in error. The proper focus is on the record actually before us now: that the 1997 subdivision plat was approved after the applicant represented that this parcel would remain as undeveloped common land. We specifically find that the Planning Commission's 1997 approval was conditioned upon this representation.

As we can find no evidence of changed circumstances that would allow an amendment to the PRD as approved in 1997, we conclude that Appellant-Applicant may not now be allowed to further subdivide the 11.33 acre parcel of common land, even if the Declaration had since been lawfully amended to remove the common land provision.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellant-Applicant's Motion for Summary Judgment is DENIED, and the Town's Motion for Summary Judgment is GRANTED. A Judgment Order accompanies this Decision.

Done at Berlin, Vermont this 30th day of June, 2006.

_____
Thomas S. Durkin, Environmental Judge

6