STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } | |
|---|---|---|
| In re Champlain College, Inc. | } | |
| 304-306 Maple Street Dormitory Project | } | Docket No. 145-7-05 Vtec |
| (Appeal of Baker, <u>et al.</u>) | } | |
|  | } | |

Decision and Order

Appellants Faye Baker, Mary Ellen Manock, Jerrold Manock, Linda Jones, Bruce L. Hewitt, Robert Leidy, Anne Geroski, Michael Rooney, Norman Williams, Susan Dorn and Carol Hewitt appealed from a decision of the Development Review Board (DRB) of the City of Burlington, approving the application of Champlain College to renovate an existing building and construct a new building at 304-306 Maple Street for student housing consisting of a total of 49 student rooms plus a head resident's apartment. Appellants are represented by Todd D. Schlossberg, Esq.; Appellee-Applicant Champlain College, Inc. (the College) is represented by Mark G. Hall, Esq.; and the City of Burlington is represented by Kimberlee J. Sturtevant, Esq.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who took a site visit after the conclusion of the hearing, alone by agreement of the parties.

Appellants are a group of eleven Burlington residents asserting standing pursuant to 24 V.S.A. §4465(b)(4). Applicant Champlain College also filed a cross-appeal; however, the City and Champlain College reached agreement on the cross-appeal issues and proposed that the Court accept their agreed revisions to the DRB decision in resolution of the cross-appeal issues. Appellants were given the opportunity to object to the City's and Champlain College's proposed settlement of the cross-appeal issues in their post-trial

1

memoranda. To the extent that the settlement of the cross-appeal addresses issues not raised in Questions 1, 4, 5, 6, 7, and 9 of the Appellants' Amended Statement of Questions, it is hereby accepted by the Court as resolving the issues in the cross-appeal. Otherwise, its issues are addressed and resolved in this decision.

Appellants' Amended Statement of Questions raised ten issues in this appeal, four of which were withdrawn on the record at trial: Question 2 (addressing lot coverage), Question 3 (addressing the proposed height of the project buildings), Question 8 (addressing stormwater) and Question 10 (addressing the impact of the project on the present or future growth patterns of the City). After the evidentiary hearing the parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

The 4.6-acre property that is the subject of this application is owned by Champlain College, Inc.; it was created by the merger of seven smaller parcels. The project property is located in an underlying University Campus (UC) zoning district, and within the Champlain College Core Campus Overlay (CCO) zoning district of the City of Burlington. The property as a whole has frontage on Maple Street, South Willard Street, and Main Street, but due to its topography has access only to Maple Street and South Willard Street. The property as a whole now contains nine existing college buildings and their associated parking lots. The property as a whole adjoins City-owned property containing the Edmunds Elementary School and Middle School, its playing fields, its parking lot and a driveway and walkway to its parking lot from Maple Street.

The portion of the property that is proposed for the present development had the address of 304 Maple Street and contains a 3,600-square-foot residential building known as the Levi Smith house. Appellee-Applicant Champlain College has applied to renovate

2

the existing building (304 Maple Street) and to construct a new 18,000 square foot building (306 Maple Street) for student housing at the project property. The project proposes 49 new student rooms to house 94 students: 39 rooms in the new building and ten in the renovated building, with shared bathroom facilities for the student rooms, plus a self-contained apartment with kitchen and bathroom facilities in the new building for the head resident.

The 4.6-acre parcel already contains a number of residential uses. The building at 308 Maple Street contains four student apartments. Whiting Hall and McDonald Hall are in use as student dormitories. Whiting Hall contains 17 rooms housing 39 students. McDonald Hall contains 18 rooms housing 39 students, with shared bathroom facilities for the student rooms, as well as one self-contained apartment for the head resident, with kitchen facilities and bathroom, which is proposed to be discontinued when or before the proposed project is built. Meal service for the students is provided in a different building.

The Champlain College Core Campus Overlay is part of the larger institutional University Campus district, which also includes the University of Vermont and the Medical Center campuses.

Over the past ten years the demographic distribution of the student body at Champlain College has changed from a two-year, Vermont-based commuting student population, to a more traditional four-year college, having a substantial out-of-state resident student population, on the one hand, and an increase in the numbers of so-called "distance learning" or on-line students, taking courses by computer from remote locations. In keeping with the change in demographics, the demand for on-campus residential housing has risen.

The actual numbers of students physically attending Champlain College has remained fairly constant since 1988, ranging up and down from slightly under 1,900 students to slightly over 2,000 students. Over that time frame there has been an increase

in full-time (and hence residential) students and a decrease in part-time (and hence commuter) students. The majority of part-time students have tended to be night students, that is, they do not drive to campus during peak daytime commuting hours. There has also been an increase in on-line students since the on-line program began in 1993, which by definition does not generally bring students to the campus. Similarly, Champlain College is moving towards a larger proportion of full-time faculty who would be on-campus during the whole work day, as compared with adjunct faculty who commute to and from the campus more frequently during the day. However, the growth in the number of full-time employees is small.

Champlain College presented evidence that its physical limitations related to classroom space and to the dining facility make it unlikely that the College will expand beyond the 1,800-to-2,000 on-campus student population contemplated in the College's current Strategic Plan. Under that plan it is shifting its administrative offices out of the Core Campus (Hill) area and plans in the longer term to develop housing for juniors and seniors in the central business district of Burlington, with shuttle bus service to the College's Core Campus area.

Question 1 of the Statement of Questions: Whether the proposed project complies with the density requirements of the Zoning Ordinance

The parties dispute several factors in the applicable methodology for determining density for a dormitory[1] project in the Champlain College Core Campus Overlay zoning district.

If the plain meaning of the Zoning Ordinance does not provide sufficient guidance,

---

[1] While in the present case the Court's task is to determine whether the present proposal meets the density requirements of the Ordinance as it now exists, it is to be hoped that the City will consider clarifying the density-determination methodology applicable to dormitories when considering any amendments to the Zoning Ordinance.

the Court must apply the general rules of statutory construction. In re Casella Waste Management, 2003 VT 49, ¶6. The court must first construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance," In re Stowe Club Highlands, 164 Vt. 272, 279–80 (1995), In re Appeal of Bennington School, Inc., 2004 Vt. 6, ¶12 (2004), so that no language is surplusage, In re Dunnett, 172 Vt. 196, 199 (2001), and so that the construction does not produce an absurd result. In re: Kim Wong Notices of Violation, Docket Nos. 169-7-06 Vtec and 293-12-06 Vtec (Vt. Envtl. Ct., March 12, 2007). If provisions on the same subject matter are ambiguous and potentially in conflict, "the more specific provision controls over the more general one." Stevenson v. Capital Fire Mut. Aid Sys., 163 Vt. 623, 625 (1995).

The first potential ambiguity is found in the relationship between §3.2.7(e) of the Zoning Ordinance, specifically setting density for the Champlain College Core Campus Overlay district, and the general density requirements in Article 5, Part 2 of the Zoning Ordinance, in which § 5.2.1 (Table 5-B) provides that the maximum allowable residential density is 20 dwelling units per acre in the University Campus district, which is classified as one of the City's medium density zoning districts.

The purpose of the Champlain College Core Campus Overlay district, as stated in §3.2.7, is "to provide a more urban configuration of the institution's core campus in order to accommodate future growth without further intrusion into surrounding residential neighborhoods." To carry out that purpose, §3.2.7(b) allows a higher than normal lot coverage of 60% (rather than the 40% otherwise provided in Article 5, Table 5-C for the UC district), and §3.2.7(e) allows a higher than normal residential density of 24 units per acre (rather than the 20 units per acre otherwise provided in Article 5, Table 5-B for the UC district). Both sections specify that the higher than normal lot coverage and residential density already include any bonuses that would otherwise be available elsewhere in the Zoning Ordinance to increase lot coverage (under §5.3.4) or to increase residential density

5

(by providing inclusionary units[2]).

Applying the Champlain College Core Campus Overlay district's specific residential density provision harmonizes the ordinance provisions and avoids surplusage. Within the CCO, the maximum residential density is 24 units per acre, regardless of whether the units qualify for an inclusionary unit bonus. Within the University Campus district but outside of the CCO, the residential density is 20 units per acre, unless the project qualifies for the higher 24-unit-per-acre density due to the inclusionary housing bonus.

Accordingly, on the entire 4.6-acre parcel, the maximum residential density is 110.4 "units."

The more difficult problem, that is, the more ambiguous provisions in the Ordinance, relate to the definition of "unit" as dwelling unit, housing unit, rooming unit or their functional equivalents, when applied to a dormitory.

The problem arises from the fact that dormitory rooms do not fit within the definition of dwelling unit in the Zoning Ordinance, nor is an equivalency method provided explicitly to convert dormitory rooms to a dwelling unit equivalent, as is provided with regard to nonresidential areas in §5.2.4. The density requirements in §§5.2.1 through 5.2.6 set out the density in terms of the "maximum net dwelling units per acre," Table 5B, yet use the terms "residential unit," "unit," and "inclusionary unit" without the

---

[2] Section 5.2.6 provides for certain exceptions to maximum allowable density, and in particular provides in §5.2.6(c) that, "[f]or any district where inclusionary housing units are provided, exceptions to maximum densities shall be permitted in accordance with the provisions of Article 14." While dormitory projects in the University Campus zoning district for an institution's own students are exempt from the Article 14 requirement to provide inclusionary housing, §14.1.16(a), nothing in Article 14 prohibits an institution from doing so and thereby qualifying for a density bonus under §14.1.14. Table 14-B provides that the density bonus for inclusionary housing in the University Campus zoning district would allow a maximum of 24 dwelling units per acre with the bonus, the same as that already provided in §3.2.7(e) for the CCO.

modifier "dwelling" and without any further definition (except that "inclusionary" housing is addressed in Article 14 and has a special section within the definitions).

Within that section of the definitions, another term, "housing unit," is defined by reference to the terms "dwelling unit" and "rooming unit,"[3] as defined by Chapter 18 of the Burlington Code of Ordinances, and excludes temporary occupancy such as hospitals and hotels. The definition of "housing unit" further provides that any four "rooming units" are to be considered as a single housing unit "in applying the housing replacement requirements of Article 15." § 30.1.2. However, it does not provide that four rooming units are to be considered as the equivalent of a dwelling unit for the purpose of calculating density.

In the absence of a defined method for applying the density provisions of the Zoning Ordinance to dormitory rooms, and recognizing that dormitory rooms are "rooming units," it was not unreasonable for the City's Planning and Zoning staff to attempt an interpretation that would enable the DRB to calculate density[4] for this project. The City chose to apply the four-rooming-units equivalency used for requiring Article 15 housing replacement.

The equivalency of four dormitory rooms for one four-bedroom dwelling unit might be a reasonable one for a dormitory having only single and double rooms. It becomes unreasonable, as calculated in Appellants' memorandum, if the dormitory rooms each were to be occupied by three or four or more students, as it allows for a much higher density of

---

[3] "Rooming unit" is defined in §18-2 of the Burlington Code of Ordinances to mean a "room or group of rooms forming a single habitable unit used or intended to be used for living and sleeping, but not for cooking or eating purposes." A dormitory room does fall within this definition.

[4] It might have been helpful also to apply the method of dividing the gross floor area of the project by 1,500, to see what the density equivalent would have be applying the §5.2.4 method, just as a check on the reasonableness of the other methods, however the parties did not provide that evidence.

occupation than would the standard sizes of dwelling units.  While that method is the interpretation of the ordinance by the administrative body responsible for its execution, which is usually helpful to the Court, that method has not been applied consistently enough to be given great weight.  See In re Appeal of Korbet, 2005 VT 7, ¶10.  We have therefore proceeded to calculate the project's  density using both the method of counting each dormitory room as a residential unit, and by counting each four units as a dwelling-unit equivalent.  The project meets the requirements of the Zoning Ordinance using either method.

The first step is to determine whether there is remaining allowable density on the property by calculating the existing residential density of the project property as a whole. The existing buildings in residential use on the project property are the 308 Maple Street house, and the two dormitories: Whiting Hall and McDonald Hall.  The 308 Maple Street house contains four apartments.  Whiting Hall contains 17 rooms housing 39 students. McDonald Hall contains 18 rooms housing 39 students, plus one self-contained apartment with kitchen facilities and bathroom, for the use of the head resident. The McDonald Hall head resident apartment and the four apartments in 308 Maple Street each count as one dwelling unit.

Using the "rooming unit" method of treating each student room, regardless of the number of beds, as one residential unit, the total number of existing residential units is 5 (apartments) plus 17 in Whiting Hall plus 18 in McDonald Hall, for a total of 40 residential units.

Using the City's method of treating four student rooms as a residential unit, also regardless of the number of beds, the total number of existing residential units would be 5 (apartments) plus 4.25 in Whiting Hall plus 4.5 in McDonald Hall, for a total of 13.75 residential units.

The next step is to determine the nonresidential[5] density equivalent, derived from the nonresidential gross floor areas for all buildings in the project area not either contained in a dwelling unit or in hallways, elevator shafts, or stairways serving the dwelling units. §5.2.4. The existing nonresidential gross floor area in the project property as a whole consists of 4,054 square feet in the Grace Goodhue-Coolidge building, 633 square feet in the Gallery, 12,493 square feet in Skiff Hall, 3,354 square feet in the Skiff Sheds, 4,371 square feet in the Advising Center, and 1,320 square feet in the Infirmary within Whiting Hall,[6] for a total of 26,225 square feet. The College also included in the existing nonresidential floor area an estimate of 3,000 square feet for the vacant Levi Smith house, as it is not in residential use due to its vacancy; including that space would bring the total existing nonresidential space to 29,225 square feet. The total must be divided by 1,500 square feet to obtain the nonresidential density equivalent number of dwelling units for the purposes of density calculation: 29,225 divided by 1,500 is 19.48 equivalent units.

Thus, using the "rooming unit" method, the existing density is 40 + 19.48, totaling 59.48, which is to be rounded at the end of the calculation to 59 units under §5.2.3. Using the City's method, the existing density is 13.75 + 19.48, totaling 33.23, which is to be

---

[5] The College suggests that a determination of the nonresidential density equivalent is not called for under the density provisions for the CCO district in §3.2.7. However, this section does not exempt a project from the provisions of the remainder of the Zoning Ordinance, it simply provides several specific provisions only applicable in that district, including a higher total allowable residential density to be used in performing the Article 5, Part 2 calculations. The College's interpretation would allow the absurd result that it could fully build the project parcel with nonresidential uses and then build an additional 110 residential units on this property, regardless of the intensity of the nonresidential uses.

[6] Appellants argue that hallways, elevator shafts, and stairways in the dormitory buildings should have been counted as nonresidential area. To the contrary, those areas were correctly excluded from the nonresidential area calculations under § 5.2.4, which counts as nonresidential those areas that are not either within the residential units or within hallways, elevators and stairways serving the residential units.

9

rounded at the end of the calculation to 33 units under §5.2.3.

The project proposes to add two dormitories with a total of 49 rooming units, to add an apartment for the head resident in the new dormitory, and to remove an apartment[7] for the head resident from McDonald Hall. The project property as a whole with the proposed project would retain as residential the 308 Maple Street house, Whiting Hall and McDonald Hall, all of which would contain the same number of units as in the "existing" calculation, with the exception of the removal of the apartment from McDonald Hall.

Using the "rooming unit" method of treating each student room, regardless of the number of beds, as one residential unit, the total number of residential units in the proposed project is 5 (apartments) plus 17 in Whiting Hall plus 18 in McDonald Hall plus 49 in the two project buildings, for a total of 89 residential units.

Using the City's method of treating four student rooms as a residential unit, regardless of the number of beds, the total number of existing residential units would be 5 (apartments) plus 4.25 in Whiting Hall plus 4.5 in McDonald Hall, plus 9.75 in 306 Maple Street and 2.5 in 304 Maple Street, for a total of 26 residential units.

The nonresidential gross floor area in the project property as proposed would consist of 4,054 square feet in the Grace Goodhue-Coolidge building, 633 square feet in the Gallery, 12,493 square feet in Skiff Hall, 3,354 square feet in the Skiff Sheds, 4,371 square feet in the Advising Center, and 1,320 square feet in the Infirmary within Whiting Hall, for a total of 26,225 square feet. Divided by 1,500 square feet per nonresidential equivalency, the nonresidential equivalency for the proposed project is 17.48 equivalent units.

Thus, using the "rooming unit" method, the project residential density is 89 + 17.48, totaling 106.48, which is to be rounded at the end of the calculation to 106 units under §5.2.3. Using the City's method, the project residential density is 26 + 17.48, totaling 43.48,

---

[7] No party suggested that this space would be converted to dormitory room use or to a nonresidential use requiring adjustments in the calculations.

10

which is to be rounded at the end of the calculation to 43 units under §5.2.3. Both methods bring the project under the maximum allowable density of 110 units.

Question 4 of the Statement of Questions: Whether the proposed project complies with the setback requirements of the Zoning Ordinance

Appellant-Applicant has merged seven lots into a single large lot, including the parcel formerly known as 304 Maple Street containing the Levi Smith House and proposed for the dormitory development at issue in this case. The single remaining lot is a corner lot, as it abuts two streets: South Willard Street and Maple Street, at their intersection.[8] §30.1.2 (definition of "Lot, corner"). As a corner lot, the lot has more than one front yard: it has one facing South Willard Street, one facing Maple Street, and one facing Main Street. §5.3.5(a). In re: Hartland Group, 237 North Ave. Project, Docket No. 120-6-05 Vtec (Vt. Envtl. Ct., Dec. 14, 2006), slip op. at 13–16. For the reasons analyzed in Hartland Group, and based on the consistent interpretation by the entity charged with implementing the Ordinance, the lot lines perpendicular to each of the streets are considered to be side lot lines, so that both the lot line perpendicular to Maple Street and the lot line perpendicular to South Willard Street are side lot lines. And see Appeal of Comi, Docket No. 95-6-04 Vtec (Vt. Envtl. Ct., March 14, 2005); In re Appeal of Green Mountain Habitat for Humanity, Docket Nos. 19-1-02 Vtec and 88-4-02 Vtec (Vt. Envtl. Ct., Dec. 12, 2002).

Therefore, the setbacks applicable to the new building, as defined by §5.3.5 for the University Campus zoning district, are 15 feet for the front yard setback requirement, and the maximum of 20 feet for the side yard setback, applicable to both the westerly and the northerly sides of the proposed new building. The proposed project meets those setbacks.

---

[8] It is also a corner lot by virtue of the Main Street/South Willard Street intersection, making it a so-called "through" lot, however, the Zoning Ordinance's only section distinguishing a through lot from a corner lot is with respect to height calculation not at issue in this appeal. Compare §§5.3.19(e), (f) and (h).

Champlain College, like all the colleges, universities, and medical institutions within the University Campus zoning district, is required by §10.2.1 of the Zoning Ordinance to provide off-street parking and loading facilities "consistent with its needs," according to the standards specified for each use in §§10.1.8 and 10.1.9. Section 10.2.1 requires the College to "maintain and monitor[9] a comprehensive parking, loading and storage plan," and to establish a facility-wide permit system to implement that plan.

Section 10.2.1 also requires Champlain College to submit its institutional parking plan, including any modifications, with each permit request "which would increase parking demand." Accordingly, the DRB has approved or required changes in various past iterations of the Champlain College institutional parking plan, in connection with past permit approvals. To the extent that those approvals became final without appeal, the College's Institutional Parking Plan cannot now be challenged, either directly or indirectly. 24 V.S.A. §4472(d). That is, all that could be before the Court in the present appeal are the differences from the past approved plans as they relate to any additional parking demand generated by the proposed dormitories.

However, we note that in connection with the present application the DRB did not review or approve the College's institutional parking plan; rather, it required the College to implement certain improvements in its parking enforcement program and to "return to the [DRB] for review and approval of an updated" Institutional Parking Plan that addresses the criteria in §10.2.2. This has been a consistent practice of the DRB, possibly to coordinate the timing of such review with the institution's annual presentation of its institutional

---

[9] The DRB apparently also requires the institutions in the UC district to submit a joint institutional parking plans on an annual basis, independently of permit proposals which might trigger review under §10.2.1.

parking plan for DRB review.

Section 10.2.2 requires the DRB to make a finding that seven listed criteria are met by the parking plan, in reviewing a permit requested by the College. With regard to the number of parking spaces required, §10.2.2(c) requires the parking plan to provide "a minimum of ¾ spaces for each vehicle permit issued" per §10.1.8 (which lists the number of off-street spaces required to be provided for listed uses). Section 10.2.2(c) also allows the DRB to determine that the ratio of ¾ spaces per vehicle permit is inadequate to fully meet the College's parking needs, in which case it may require a higher parking standard for each individual structure or use, but may not set a standard higher than those specified in §10.1.8 (that is, Table 10-A).

Table 10-A contains two references to use categories applicable to a college dormitory. Under the general heading of "Residential uses," the use category of "dormitory" requires one parking space per two beds, which would require 47 spaces for the 94 new beds in this project.[10] Under the heading of Institutional/Public uses, the use category of "college" requires ¾ of a space for each parking sticker issued.

These two sections can be harmonized without making surplusage of either one, by reading them in light of §§10.2.1 and 10.2.2 which are specific to institutions in the UC zoning district. Dormitories (as well as fraternities and sororities) not located in the UC zoning district are treated as residential uses requiring one off-street space for every two beds, without regard to the institution with which they may be associated. Within the UC zoning district, by contrast, a college must provide ¾ of a space for each parking sticker issued, but its parking plan must also demonstrate that the number of permits issued is a realistic reflection of its needs, and also that the ¾-of-a-space ratio is adequate to meet its

---

[10]   As the head resident apartment in McDonald Hall has been removed, no additional parking demand needs to be accounted for from the new head resident's apartment in 306 Maple Street.

needs. If not, for any individual proposed structure or use, the DRB may require the college to provide up to the number of spaces that would otherwise be required in Table 10-A.

It has also been the consistent practice of the DRB and the City's Planning and Zoning staff, in analyzing parking requirements for college projects located within the University Campus district, to apply the standard of ¾ of a space for each parking sticker issued.

In the present case, Champlain College first argues that §10.2.1 is not triggered because the proposed new dormitory will not "increase parking demand," based on the expected reduction in commuter students (who will become residential students in the proposed new dormitory). The evidence suggests that only from 32% to 37% of residential students require parking spaces, as compared with 75% to 87% of commuter students, so that the overall parking demand from the students in the new dormitory may be less than it would have been if they had all commuted. However, unless none of the students in the proposed new dormitory will ever have visitors, need deliveries, or need to bring a car to the dormitory, the addition of 94 students to the property can be expected to generate some types of parking demand that will need to be accommodated in the vicinity of the building, even if all vehicles brought to campus by those students are kept during the week in remote parking. The proposed project therefore triggers §10.2.1 and needs to be accounted for in the College's Institutional Parking Plan.

Moreover, because the proposed new dormitory will reduce the parking available in the McDonald-Whiting parking lot by five spaces as shown on the site plan (Exhibit 3), and because it will increase the parking demand within the McDonald-Whiting lot for some number of accessible parking spaces that can reasonably be expected to be associated with the new accessible student rooms on the ground floor of 304 Maple Street, the Institutional Parking Plan must address the localized parking demand generated by the dormitory, even

14

if the dormitory represents a reduction in the institution-wide parking demand.

Further, even if sufficient spaces are available at the Gilbane lot or other remote locations, the College must analyze and address what changes in the Institutional Parking Plan may be necessary, if any, to encourage, enable or require students with vehicles to do, at a minimum, all of the following: 1) actually to register the presence of those vehicles with the College, even if they are parked at a private off-campus location; 2) actually to obtain a parking sticker to park those vehicles (whether in campus lots or on the street) in the UC or CCO districts, so as to facilitate studies of parking behavior as well as enforcement of parking limitations; 3) actually to use the shuttle services available to access the remote parking; 4) actually to use the remote parking lots rather than to attempt to park in the adjoining neighborhood or in lots they are not authorized to use; and 5) actually to be assessed and actually to have to pay fines assessed at a level and with sufficient consequences for non-payment so as to have a deterrent effect on inappropriate parking behavior and to have an incentive effect on appropriate or desired parking behavior. The 2005 Resource Systems Group's evaluation of Champlain College's parking program, in evidence as Exhibit 14-C, supplemented by the shorter 2006 memorandum in evidence as Exhibit 14-B, represent a good starting point for evaluating strategies to improve the College's use of its parking resources, but it is only a starting point.

As a member of the Campus Area Transportation Management Association (CATMA), Champlain College subsidizes the use of shuttles and Chittenden County Transportation Authority buses that run throughout Burlington, and proposes that such buses and shuttles will be free to students, employees, and faculty in connection with the proposed project. As a member of CATMA, the College also provides carpool matching, and its students ride the University of Vermont's off-campus evening buses at no charge. Champlain College encourages bicycle use by providing bicycle racks throughout campus, including spaces for fifty bicycles in connection with the proposed project.

15

Champlain College has some flexibility in addressing its overall parking needs, adjusting to the anticipated class schedules of its commuting students, although it must account in its parking plan for the parking demands generated by those students' use of its library, business center, and student leisure activities facilities at other than class hours. Evidence was presented suggesting that residential students need access to vehicles in the remote lots primarily for weekend leisure activities and for part-time jobs, yet the current shuttle services do not accommodate those time frames. Evidence was presented suggesting that on-campus lots may be available for the use of residential students during the weekends, but not how the College proposes to regulate such use. No evidence was presented regarding how the parking of visitors to the proposed dormitory project may be regulated, nor whether the parking plan contemplates the use of temporary visitors' passes or stickers.

Because the DRB did not review or approve the College's institutional parking plan in connection with the proposed application, but instead required the College to implement certain parking-related improvements and then to seek DRB approval of its updated Institutional Parking Plan under the criteria in §10.2.2, it remains for the DRB in the first instance to rule on[11] any proposed revisions to the Champlain College Institutional Parking Plan as it relates to the proposed project. Accordingly, as the project only will satisfy the parking requirements of the Ordinance if the operation of its parking sticker program is improved, particularly with respect to the use of the remote lots, any approval of the occupancy of the proposed dormitories will have to be conditioned on the approval of such project-related revisions to the College's Institutional Parking Plan (the College's portion of the Joint Institutional Parking Plan).

[11] It is premature in the present appeal for this Court to address Appellants' concerns regarding their participation in any DRB review of the College's Institutional Parking Plan, as it relates to this project, or in any potential appeal of such DRB action.

16

efficient, effective, and adequate traffic circulation and will not result in traffic burdens which are detrimental to surrounding properties; and whether the proposed project will adversely affect traffic on streets in the vicinity of the project

The Court recognizes that the presence of Champlain College, the University of Vermont and the other business and institutional uses along Main Street in the approach to the downtown business district create pressures on traffic on the more residential neighborhood streets near these uses. However, in the present appeal we must analyze only the effect on traffic of the proposed dormitory project, distinct from the parking issues discussed with respect to Question 5 of the Statement of Questions, and distinct from the general traffic issues caused simply by the presence of the institutional uses and the proximity of the area to downtown Burlington.

Access to the proposed dormitory buildings does not change either the on-site circulation within the Whiting/McDonald parking lot, nor in the driveway from the Whiting/McDonald parking lot onto Maple Street. The proposed project allows for efficient, effective, and adequate on-site circulation and circulation from the project site onto the adjoining street.

Except for the days when the students move into or move out of the dormitories, the dormitories themselves will not generate additional traffic during peak hours. Any of the student residents with vehicles will be required to park at a remote lot, other than those needing wheelchair access. Students' use of their vehicles is anticipated to take place largely on weekends. To the extent that the proposed dormitory project is expected to accommodate students who otherwise would have commuted to the campus by car on a daily basis to attend classes and use the library and other campus facilities, the proposed dormitory project will reduce the traffic generated by the College as a whole. If the parking plan is revised to address the changes in and enforcement of actual parking behavior

17

discussed in the previous section, the proposed dormitory project will not result in traffic burdens which are detrimental to surrounding properties and will not have an adverse affect on traffic on streets in the vicinity of the project.

Although the intersections of South Willard Street with Main Street and with Maple Street may have high accident rates and may experience heavy traffic in early morning and mid- afternoon times, when Edmunds Elementary and Edmunds Middle School students cross at these intersections, the proposed dormitory project will not in any way exacerbate these conditions, as the dormitory residents are not expected to use their vehicles at those times on weekdays when the school is in session. The proposed project also improves the pedestrian pathway from Maple Street onto the Edmunds campus, reducing the potential for pedestrian conflict with traffic.

Questions 7 and 9 of the Statement of Questions: Whether the proposed project is consistent with the existing scale and neighborhood patterns and whether it will adversely affect the character of the neighborhood

The existing scale and neighborhood patterns and the character of this neighborhood include two- and three-story residential buildings on Maple and South Willard Streets, but equally include the larger Champlain College institutional buildings, some of which are newly built and some of which represent former large historic residential buildings. The neighborhood pattern also includes the very large school buildings of the Edmunds Elementary and Middle School complex, and other large historic residences on South Willard Street, some of which have been converted to office, historic inn, or multi-family use.

Because the neighborhood includes many different building styles and sizes, and has included both the Champlain College Core Campus use and the Edmunds School campus use at least since the early 1970s, the proposed project is consistent with the existing

neighborhood patterns and scale, both as to buildings and use, even though the proposed new dormitory building would be among the larger buildings in the neighborhood. The proposed new building is designed with a roof shape and dormers that break up the mass of the building, minimizing its apparent bulk in comparison with the Edmunds School complex and the institutional buildings on the Champlain College campus within the Core Campus Overlay district.

Indeed, the use of property in the Core Campus Overlay district for a college dormitory is an expected use in this district, as the district was planned to become more densely populated than the neighboring residential area, exactly to keep that type of campus residential growth out of the adjoining neighborhood. §3.2.7. The proximity of the core campus uses to the Edmunds School parking lot, walkway, and playing fields was in place when the overlay district was adopted; no unanticipated conflict between the college students and the Edmunds students should result from the Edmunds students use of the playing fields or the walkway.

The placement of the project within the Core Campus of Champlain College, and, to the extent practicable on the property, adjacent to the Edmunds School playing fields rather than to neighboring residences, also is consistent with the purpose of the underlying University Campus zoning district, which is intended for the College's use "while preserving the residential character of existing neighborhoods within and adjacent to the district." §3.1.6.

The proposed project will not adversely affect the character of the neighborhood, in fact, it is sympathetically designed to blend with the architecture of the older historic buildings in the area. Although it is located at a higher elevation than and on the southern boundary of the Edmunds playing field, the greater elevation of the project site and the trees and buildings already in place near the property boundary already cause some shading of the field. The degree of additional shading of a portion of the southerly edge

19

of the field that could result from the construction of the 306 Maple Street building does not warrant disapproval of the project under this criterion.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that Applicant Champlain College's application is approved, subject to the conditions imposed in the DRB's decision (as amended by the settlement agreement between Applicant and the City regarding the issues not raised in Questions 1, 4, 5, 6, 7, and 9 of the Appellants' Amended Statement of Questions) (Exhibit 2), and subject to the additional condition that the College submit to the DRB for its approval the College's Institutional Parking Plan (the College's section of the Joint Institutional Parking Plan) as modified to address at least the matters discussed in the section of this decision relating to parking, demonstrating compliance with the criteria in §10.2.2 of the Zoning Ordinance.

If the parties wish any additional judgment order in the form of amendments to the DRB decision or otherwise, and incorporating any other language from the settlement of the cross-appeal or from this decision and order, they may file it, approved as to form, on or before April 5, 2007.

Dated at Berlin, Vermont, this 20th day of March, 2007.

_____
Merideth Wright
Environmental Judge