**STATE OF VERMONT**
**ENVIRONMENTAL COURT**

|  |  |  |
|---|---|---|
| In re Byrne Trusts NOV | } } } | Docket No. 150-7-08 Vtec |

## Decision On The Record

This appeal arises out of an on-the-record decision by the Town of Castleton ("Town") Development Review Board ("DRB"), holding that Appellants Richard and Jane Byrne ("Landowners") were responsible for three violations of local zoning laws and permits.[1] Since the Town has elected to conduct its land use proceedings on the record, and the parties have submitted their respective briefs, and the Town has provided the Court with the record from the proceedings before the DRB, we can now take up the merits of this appeal.

## Factual Background

As we have stated before in on-the-record appeals, our recitation here of the factual background of this appeal is done for the sole purpose of putting the pending appeal into context. See, e.g., In re Miller Conditional Use Application (After Remand), No. 59-3-07, slip op. at 1 (Vt. Envtl. Ct. Nov. 5, 2007) (Durkin, J.) ("We first note that this Court is not charged with the responsibility of rendering factual findings in an on-the-record appeal. Rather, our role is to review the appealed decision from an appellate perspective, giving discretion to an appealed decision when there is substantial factual foundation in the record of the proceedings below."). With this perspective in mind, we recite the following material facts, which we understand to be undisputed unless otherwise noted:

1. Landowners own[2] a 13,000 square-foot parcel of land (just under a third of an acre) at 451 Abatiell Road in the Town of Castleton.

2. Landowners used to have a roughly 830 square-foot seasonal cottage on their lot.

3. Ms. Byrne suffers from a progressive and debilitating neurological disease that currently prevents her from doing tasks such as shoveling snow. Ms. Byrne also states that it is likely that she will require wheelchair accessibility at her home at some point.

---

[1] Landowners are represented by David R. Cooper, Esq., and the Town is represented by John S. Liccardi, Esq.

[2] Mr. and Mrs. Byrne are listed as the owners on all zoning applications in the Record before us. However, there are other references that infer that they are trustees to two separate family trusts and hold legal title to the subject property as the respective trustees of these two separate trusts. The manner in which the Byrnes hold title to the subject property does not impact upon the legal issues we address in this Decision.

1

4.     On April 3, 2006, Landowners applied for a permit to replace their cottage with a year-round, 1,965 square-foot ranch-style home and attached garage. (See R. at Ex. 1 ("First Application").) Landowners later modified their First Application to request approval for a two-story home with a 1,403 square-foot footprint and a 500 square-foot detached garaged. Because a zoning regulation in effect at the time limited the footprint of the new building to 1,245 square feet (150% of the existing 830 square-foot cottage), Landowners requested a variance as well.

5.     On June 22, 2006, the DRB denied the requests in the First Application for a variance and a permit. (See R. at Ex. 2 ("First Decision").)

6.     No one appealed the First Decision.

7.     On July 7, 2006, Landowners filed a second permit application, this time seeking authority to construct a home with a 1,242 square-foot footprint and detached garage. (See R. at Ex. 3 ("Second Application"); see also Landowners' Br. at 4 (providing a better photocopy of the applicable part of a sketch submitted with the Second Application).)[3] Believing that the size of the proposed detached garage was not relevant to the permit approval they needed (see Byrne Aff. at ¶ 7),[4] the Second Application did not state the square footage or dimensions of that garage

---

[3]    Although the Town provides a photocopy of this same sketch at page 3 of its Printed Case, we do not find the Town's version to be an accurate representation of what Landowners actually submitted with their application. Specifically, the Town's version contains the numbers "22" and "24" written as the dimensions of Landowners' proposed detached garage, and also has the following notation in the lower right-hand corner: ~20' = 1' (which presumably meant to say that ~20' = 1"). But the numbers "22" and "24" were not on the original application, nor were they ever put forth by Landowners; rather, as is made clear during the hearings regarding the subject of this appeal, the Town Zoning Administrator Bill Martinez states that "those are my numbers written in there." (DRB Hearing (Apr. 15, 2008).) The Court discovered this during a review of the tape recordings from the DRB hearing.

According to Martinez's testimony, at least one of his dimensions for the garage was derived by "scal[ing] it off this drawing." (Id.) The scale itself—namely, the notation comparing 20 feet to 1 inch—also does not appear on the Second Application that is part of the official Record of this case. (See R. at Ex. 3.) Although the official version of the Second Application is a rather poor photocopy, it does not contain even a hint of a mark in the place where the Town's version in its Printed Case has a scale on it. Nor does any scale appear on Landowners' replication of the Second Application. (See Landowners' Br. at 4.) Rather, as with the numbers "22" and "24," the scale itself seems to be another one of Martinez's additions, not a part of the original Second Application. We also note that the scale itself is of limited value, given that it is not accompanied by a drawing of what one inch on the original document is (something that is important when a document is being photocopied, as these documents clearly were). At any rate, on this Record, where the official version of the Second Application states nothing about any scale, and does not include the numbers "22" or "24," we must conclude that the sketch accompanying the Second Application did not have a scale or the numbers "22" or "24" written on it.

The Court was surprised to see that the Town submitted a document that had subsequent notations on it that were not clearly identified as belonging to someone other than the original drafter of that document. This was particularly problematic here because that document's official version in the Record is a poor photocopy. When a municipality decides to go "on the record," it becomes incumbent upon it to take extra care in preserving the record of their proceedings and ensuring that all documents submitted on appeal are readable and accurately marked (for instance, with all subsequent alterations that are made to a document initialed by the person who made those alterations).

[4]    The Byrne Affidavit was made part of the Record at the May 6, 2008 DRB hearing.

2

(see R. at Ex. 3).[5]  The parties dispute whether the sketch accompanying the Second Application was drawn to scale, but no scale appears on the official version of the Second Application.  (See R. at Ex. 3.)[6]  Aside from the Second Application itself, Landowners did not submit any additional evidence or testimony regarding the Second Application.

8.      On August 2, 2006, the DRB approved the Second Application and granted Permit #7131 to build a house and detached garage.  (See R. at Ex. 4 ("Second Decision").)  The Second Decision makes no reference (in its factual findings, its conclusions or law, its order, or its list of conditions) as to the size of the detached garage.  (See id.)  The Second Decision contains only the following two conditions on the permit:

1.  This approval constitutes only local (subdivision/zoning) approval and does not in any way relieve the applicant from the requirements of obtaining any and all other required state or local approvals or permits.

2.  Use of the westerly leach field is to be discontinued as per the Castleton Health Officer.

(Id.)

9.      No one appealed the Second Decision.

10.     At the time construction began in the fall of 2006, Landowners provided Town Zoning Administrator Bill Martinez with a complete set of architectural plans for the house and the detached garage.  (Byrne Aff. at ¶ 8.)  These plans showed a covered walkway on the side of the garage and depicted both the house and garage "as they have now essentially been built."  (Id.)

11.     Landowners then built the house and detached garage with a covered walkway.

12.     On August 2, 2007—one year after the DRB issued its Second Decision, granting Permit #7131 to Landowners—Zoning Administrator Bill Martinez drafted a memorandum to the DRB on his "Compliance Analysis with Permit #7131."  (See R. at Ex. 6 ("Compliance Memo").)  The Zoning Administrator explains in the Compliance Memo that he was doing this analysis "pursuant to a DRB request."  (Id.)  The Zoning Administrator's testimony further explains that he had received a complaint in July 2007 that Landowners' residence appeared too large.  (See R. at Ex. C-1 Testimony.)[7]  His testimony also explains that he "examined the Lister's card" to

---

[5]  As explained in footnote 3, above, the dimensions that appear on this sketch in the Town's Printed Case were not part of the Second Application.

[6]  See also footnote 3, above, for a discussion of this issue.

[7]  The Record contains two documents labeled "C-1."  For clarity, we refer to Bill Martinez's written testimony at the April 15, 2008 DRB hearing as "C-1 Testimony," and we refer to what Landowners submitted on August 15, 2007, in their third application to the DRB as "C-1 Application."

3

determine compliance. (Id.) The Lister's card has a sketch of the garage that shows the main portion of the garage as 24' by 26' (624 square feet) and the covered walkway portion as 24' by 6' (144 square feet). (R. at Ex. 5.) Adding those numbers together, the Zoning Administrator calculated the total square footage of the garage as 768 square feet. (See R. at Ex. 6.) The Zoning Administrator also used the Lister's card to calculate the footprint of the house and mistakenly determined it to be 1,168 square feet. (See id.) Using his calculations of the house footprint and the total square footage of the garage (including the covered walkway), he then concluded that "the Byrne house, as-constructed, is in compliance with [the] DRB Order." (Id.)

13.    The Zoning Administrator sent a copy of the Compliance Memo to Landowners' building contractor. (See R. at Ex. C-1 Testimony.)

14.    On August 15, 2007, Landowners filed a third permit application, this time proposing to construct a "[h]andicapped accessibility structure from garage to residence." (See R. at Ex. C-1 Application ("Third Application").) The Third Application included a sketch of the "[p]roposed connection" that shows hash marks covering the gap between the house and the garage. (Id.) Although the hash marks clearly cover all six feet of the gap between the house and the garage (thereby connecting the two), it is not clear how wide an area the roof of the connector covers. The sketch notes that the "enclosed area" of the connection would be 12-feet wide. (Id.) The hash marks undoubtedly extend beyond that enclosed area to either side. (Id.) Although it is not entirely clear how far those marks extend, it appears to be roughly 6-feet to one side to cover the 6-foot width of the covered walkway portion of the garage, thereby providing a covered walkway to the house door. (See id.; see also Byrne Aff. at ¶ 11 ("It was particularly important to me to have a roof covering the front door. We have a metal roof, and we get large accumulations of snow on the roof that slide off all at once. Also, because of the garage to the south, snow falling in this area melts slowly. Without a covering over the front door, that door would become completely blocked off for extended periods during the winter months.").) The hash marks appear to go roughly the same 6-foot distance in the other direction as well, thus making for a total proposed roof coverage of approximately 24 feet. (See R. at Ex. C-1 Application.)[8]

---

[8]    On September 4, 2007, the DRB held a hearing on the Third Application, and we expect that this hearing likely clarified exactly how long of a connection Landowners proposed to make. (In fact, Landowners submitted a tape of that hearing to the Court to explain what was represented at that time.) Nevertheless, that hearing is not a part of the Record that is currently before the Court, and we therefore cannot credit any representations that were made at that

4

15. On September 18, 2007, the DRB conducted a site visit regarding the Third Application.

16. On October 17, 2007, the DRB approved the Third Application and granted Permit #7248 to build a handicapped accessibility structure connecting the house to the detached garage. (See R. at Ex. 10 ("Third Decision").) The Third Decision contained the following Finding of Fact: "The applicant stated a roof covering a 6 ft. by 12 ft. area between the residence and garage would meet her handicap accessibility needs." (Id.) The Order section of the Third Decision stated that "[b]ased on the Facts above," the application was approved. (Id.) No conditions were attached to this approval. (Id.)

17. No one appealed the Third Decision.

18. Sometime after the Third Decision was issued, Landowners built a 6-foot by 12-foot enclosed area between the house and garage, covered by a roof that extends a length of somewhere between 27 and 30 feet total, around 6 feet of which covers an area between the garage and house where the electric service meter is located. Landowners' builder thought it important to cover this meter and therefore extended the roof an additional 6 feet or so from where the roof was originally designed to end.

19. On March 18, 2008, Town Zoning Administrator Bill Martinez issued a Notice of Violation ("NOV") to Landowners, alleging the following three violations:

Permit #7131
1. The DRB Order states that the size of the approved footprint for the residence is to be 1242 sq. ft. and the Lister measurements indicate that the residence constructed has a footprint in excess of 1300 sq. ft.
2. The garage was testified to, and not done on the permit application to be a typical, two-car garage, of 522 sq.[]ft. but as built, measures 624 sq[.] ft[.] connected to a 6' x 26' walkway under the same roof. This results in a garage area of 624 sq. ft. plus the roofed walkway area for a total of 780 sq. ft. for the structure. The 6' walkway was not part of the permitted project.

Permit #7248
3. The last piece of this project, Permit #7248, was to be a roof covering a 6' x 12' area between the residence and the garage. The roof covers an area measuring at least 6' x 20'.

(NOV at 1–2.)

20. Landowners filed a timely appeal of the NOV with the DRB.

hearing, unless those representations are reflected in either the application itself or the accompanying permit that the DRB issued.

21.    On April 15, 2008, and May 6, 2008, the DRB held on-the-record hearings on the alleged violations.

22.    On June 18, 2008, the DRB issued its Findings of Fact, Conclusions of Law, and Order ("DRB Order"), concluding that Landowners were responsible for three violations of local zoning laws and permits. That DRB Order is the subject of this on-the-record appeal.

### Discussion

The Town of Castleton has adopted and implemented the proceedings necessary to make this an on-the-record appeal. See 24 V.S.A. § 4471(b). This Court has previously explained the appropriate standard of review in these types of appeals: "In an on-the-record appeal, the DRB's factual findings are to be affirmed if supported by substantial evidence in the record as a whole. Legal issues, on the other hand, are reviewed without affording deference to the DRB's legal conclusions." In re Edgar Northshore Drive Variance Application, No. 292-12-07 Vtec, slip op. at 1 (Vt. Envtl. Ct. Feb. 5, 2009) (Wright, J.) (internal footnote and citation omitted). The reference to reviewing legal issues "without affording deference" to the DRB is another way of saying that we review legal issues de novo. Cf., e.g., State v. Bain, 2009 VT 34, ¶ 15 (noting that even when a reviewing court "applies a deferential standard of review to the trial court's finding[s] of fact[,] . . . [l]egal conclusions are reviewed de novo" (quotation omitted)).

The Court has also previously explained why the substantial evidence test applies to factual determinations made by the DRB in an on-the-record proceeding. See In re Miller, No. 59-3-07, slip op. at 4–5. As to what is required by the substantial evidence test, we have stated the following:

> Evidence is substantial if it is relevant and a reasonable person, looking at the record as a whole, could accept it as adequate. In addition, . . . substantial evidence is more than a scintilla of evidence; a reviewing court does not examine the record only to determine if there is substantial evidence to support the agency's decision, but it also must examine the conflicting evidence to determine if the hearing examiner could have reasonably made its finding and orders upon all of the evidence before it.

Id. at 5 (internal citations and quotations removed).

In light of our duty to review factual findings for substantial evidence, and to review legal issues de novo, we address each of the three violations that the DRB found when it conducted its hearings on this matter.

6

**I.** **Whether Substantial Evidence Supports a Finding that Landowners' House Exceeds Its Permit Limitation of a 1,242 Square-Foot Footprint**

The DRB's first Conclusion of Law upheld the Zoning Administrator's finding of a violation regarding the size of the footprint of Landowners' house: "Based upon the above Findings, the Development Review Board finds that Section 410 of the then relevant Castleton Zoning Regulations has been violated which limits the development of the house to 1242 sq. ft." (DRB Order at 2.)

In support of this conclusion, the DRB lists two Findings of Fact. Id. at 1. The first finding is that the permit application was for a house with a 1,242 square-foot footprint. Id. This fact is undisputed and has substantial evidence in the Record to support it. (See, e.g., R. at Ex. 3.) The second finding—which provides the only expressed basis for the existence of a violation—states the following: "Based on the Lister's measurements of August 2, 2007, and a site visit by the Development Review Board of September 18, 2007, the residence measures 1308 sq. ft. Both the Listers and the Development Review Board took measurements of the footprint from the outside of the building." (DRB Order at 1.)

Even given the deferential review that we must undertake in on-the-record proceedings such as these, we cannot find substantial evidence to support the DRB's finding that the footprint of Landowners' house is 1,308 square feet.

As an initial matter, we are troubled by the DRB's reliance on "a site visit by the Development Review Board," where the DRB "took measurements." (Id.) In an on-the-record proceeding, the DRB must abide by the Vermont Municipal Administrative Procedure Act (24 V.S.A. §§ 1201–1210). See 24 V.S.A. § 4471(b) ([T]he municipal procedure act shall apply in these instances . . . ."). In particular, this Act requires that all Findings of Fact "shall be based exclusively on evidence of the record in the contested hearing." 24 V.S.A. § 1209(b) (emphasis added). As this Court often stresses whenever we have the opportunity to make a site visit, the site visit itself is not evidence, nor is it a part of the record. Thus, measurements that members of the DRB took when conducting its site visit here are not a part of the Record here.

There are many reasons why measurements taken at a site visit are not evidence. For one thing, the members of the DRB were never sworn in—and in fact never even gave testimony at all—in these hearings. See 24 V.S.A. § 1206(a) ("All testimony of parties and witnesses must be made under oath or affirmation.") We find no evidence in the Record of the DRB stating its

measurements. Even if they had been sworn in, it would not be proper for members of the DRB to give testimony in a proceeding over which they are presiding, as that would present a clear conflict of interest. Further, in on-the-record proceedings, "[t]he rules of evidence as applied in civil cases in the superior courts of this state shall be followed." 24 V.S.A. § 1206(b). In this instance, measurements taken by members of the DRB should be excluded, since they create an obvious "danger of unfair prejudice." V.R.E. 403. Thus, even if the Record revealed sworn statements by DRB members, such evidence would be improper and unfairly prejudicial, since the Landowners here would be left to either allow the DRB measurements to go unchallenged, or run the risk of alienating the factfinder by challenging the DRB's measurements. We find this latter option inconceivable, since it would require Landowners to cross-examine the DRB members themselves. In short, it is hard to imagine anything that could be more prejudicial—in terms of pre-judging a situation—than the DRB taking its own measurements at a site visit.

While we are quite certain that the DRB meant no harm—and was not acting in bad faith or with any improper motives whatsoever—when it took measurements at a site visit and then relied on those measurements in subsequent proceedings, various procedural and evidentiary rules preclude the DRB from relying on such measurements in making its Findings of Fact. We therefore decline to take the DRB's measurements from a site visit into account in determining whether substantial evidence exists to support the DRB's finding of a violation regarding the footprint of Landowners' house.

This leaves "the Lister's measurements of August 2, 2007" (marked as Exhibit 5 in the Record) as the sole basis for the DRB's finding of a violation here. (DRB Order at 1.) While such measurements might in some circumstances provide evidence—even substantial evidence—of a violation, they are problematic here for a number of reasons.

An initial problem with the DRB's finding is that it refers at one point to a singular "Lister" (when talking about "the Lister's measurements") and later in that same finding refers to "Listers" in the plural. (Id.) While this might seem like a trivial issue, it in fact highlights a blaring gap in the Record before this Court—namely, the fact that whatever Lister (or Listers) took these measurements was not present at the hearing, did not offer testimony under oath to the DRB, and was not available for cross-examination. Had a Lister (or Listers) been present, we would know how many of them took these measurements—and, more importantly, how that

8

Lister took and recorded these measurements.[9] The Lister's measurements therefore were not "made under oath or affirmation," 24 V.S.A. § 1206(a), nor was "the witness . . . available for direct testimony and cross-examination at the hearing on this evidence," as is required under § 1206(c) whenever written testimony is submitted.

The Record reveals that the sponsoring witness for the 2007 Lister's card (or Lister's sheet as it is sometimes called) was Town Zoning Administrator Bill Martinez. The evidence the DRB relied upon therefore suffered from at least one—and possibly multiple—levels of hearsay, depending on whether the same person took and recorded the measurements. The Lister's measurements, as reported on the Lister's card, can only be described as out-of-court statements offered for their truth by the Zoning Administrator. See V.R.E. 801(c) (defining hearsay). When asked whether he accompanied the Lister when the measurements of Landowners' home were taken, Martinez admitted that he did not. (DRB Hearing (Apr. 15, 2008).)

While the Lister's card might fall under a hearsay exception, such as the public records exception in V.R.E. 803(8), nothing in the Record reveals that the DRB made any attempt to wrestle with this issue. Further, had the DRB addressed the hearsay issue, it might have found a "lack of trustworthiness," V.R.E. 803(8)(b)(iv), given that the sole sponsoring witness—Bill Martinez—admitted that he did not know for certain how those measurements were taken, since he could only state that "as best he knows, the [L]isters measured the outside of the house," and "he did not know how the angles were calculated." (DRB Mtg. Minutes, at 3 (Apr. 15, 2008) (emphasis added).)

We find at least three other major problems with the reliance in this case on the 2007 Lister's card. First, a 2008 Lister's card that was admitted into evidence at the May 6, 2008 hearing (apparently without any sponsoring witness) has different dimensions for the garage, listing one side as two feet shorter and one side as two feet longer than what appears in the 2007 Lister's card, thereby creating doubt as to the accuracy of the Lister's measurements.

Second, all of the Lister's measurements are integers, implying that the Lister rounds fractional numbers to the nearest integer. While such a rounding process is understandable, given that the sole function of the Lister's measurements is to assess the approximate value of a parcel of land and its improvements, it highlights that measurements made for one purpose

---

[9] Without resolving whether one of more Listers exists in the Town of Castleton, we will refer simply to "the Lister" in the singular throughout the rest of this Decision.

(assessing property value) may not be of sufficient accuracy to determine compliance with zoning permits and regulations. Cf. In re Willey, 120 Vt. 359, 362–63 (1958) (rejecting the use of classifications made by listers as definitions for zoning proceedings).

We cannot understate how problematic rounding can be in a proceeding such as the one now before this Court, where Landowners are accused of exceeding their footprint by a mere 66 square feet (the difference between 1,242 and 1,308). If enough of the Lister's measurements were rounded up by as much as half of a foot, the total square footage could have been inflated by more than 66 square feet, thereby creating the appearance of a violation where none existed. This in itself precludes us from finding that substantial evidence exists to support the finding of a violation here.[10]

A third problem with the Lister's card is that Martinez—the only sponsoring witness of the Lister's card—testified to his own measurements and came to a different conclusion regarding the total square footage of the footprint of Landowners' house. While Martinez used a different system for determining the house's footprint, he stated in both his oral and written testimony that "from the measurements taken on the inside I can state that the resulting area covered by concrete under the house is less than 1242 sq. ft., that is based on the assumption that the foundation walls are the typical eight inches thick." (R. at Ex. C-1 Testimony.)

In short, according to the only direct testimony provided on the footprint of the building, Landowners' house appears to comply with its permit limitation of a 1,242 square-foot footprint. While it is not our job in this on-the-record proceeding to determine the credibility of certain evidence relative to other evidence, we do have to determine whether there is substantial evidence in the Record to support the DRB's finding of a violation. Here, the measurements on the Lister's card were not made under oath or affirmation or subject to cross-examination; have hearsay problems; apparently used a rounding system that could have grossly inflated the total square footage of the house; and are contradicted by the very witness who presented the Lister's card. That witness, the Zoning Administrator, presented the only other measurements that are part of the Record. His measurements do not support the DRB's finding of a violation. There is

---

[10]   Again, we are not pronouncing all measurements taken by a lister as unreliable. Rather, we are merely stating that the measurements taken here—without any supporting testimony from the Lister or any explanation as to how these measurements were taken and which (if any) of these numbers were rounded up—do not meet the substantial evidence requirement at issue here. The fact that the difference between compliance and non-compliance is so minimal here—66 square feet—highlights the reason why we must conclude that a substantial factual foundation is lacking here.

no other evidence in the Record, let alone substantial evidence, to support the measurements the DRB relied upon in rendering its legal conclusions.

While we grant deference to the DRB in factual determinations in on-the-record proceedings, here the Lister's measurements (as the sole potentially legitimate reason in this Record for finding a violation) fail to meet the minimum requirement of substantial evidence. After thoroughly reviewing the Record as a whole, we cannot say with any degree of certainty what size the footprint of Landowners' house is, nor do we find a factual foundation for the DRB's conclusion in this regard. We therefore **VACATE** the DRB's finding of a violation regarding the total square footage of the footprint of Landowners' house.

## II. Whether Landowners Have Violated the Lot Coverage Maximum

Our discussion of the second alleged violation can be brief because we find that the DRB was without jurisdiction to reach the lot coverage issue that the DRB described as the basis for this alleged violation. As mentioned earlier, the full text of the second alleged violation in the Notice of Violation is as follows:

> The garage was testified to, and not done on the permit application to be a typical, two-car garage, of 522 sq.[]ft. but as built, measures 624 sq[.] ft[.] connected to a 6' x 26' walkway under the same roof. This results in a garage area of 624 sq. ft. plus the roofed walkway area for a total of 780 sq. ft. for the structure. The 6' walkway was not part of the permitted project.

(NOV at 2.)

After the DRB held hearings on this matter, it stated the following as its Conclusion of Law regarding the second alleged violation: "Based upon the above Findings, the Development Review Board finds that section 325[11] of the then relevant Castleton Zoning Regulations has been violated which limits the development of the garage to 528 sq. ft." (DRB Order at 3.)

In short, we have a mismatch. The NOV only gave notice to Landowners that they were allegedly in violations of the terms of their permit regarding the size—and structure—of their garage. The NOV says nothing about section 325 of the Castleton Zoning Regulations, a section that deals with the maximum total lot coverage. Therefore, the issue of total lot coverage was not properly noticed and the DRB was thus without authority to consider a violation based on total lot coverage. Cf., e.g., In re Torres, 154 Vt. 233, 236 (1990) ("The general view is that

---

[11] Regulations § 325 provides the limits and uses for Zoning District "Residential 40,000" ("R-40 District"), including a maximum lot coverage for residential uses of 15%.

notice and hearing requirements on application to a zoning board are mandatory and jurisdictional, and failure to adhere to these requirements renders the action taken null and void."). Similarly, when this Court addresses an appeal, we are "limited to consideration of the matters properly warned as before the local board." In re Maple Tree Place, 156 Vt. 494, 500 (1991).

To be clear, the role of the DRB (and of this Court on appeal) in a hearing regarding an NOV is not to determine whether any zoning violation exists; rather, the proper role is to determine whether any of the noticed violations exist. Without notice to Landowners of the alleged violation of the total lot coverage rule, we cannot uphold the DRB's finding of such a violation. We therefore **VACATE** the DRB's finding of a violation regarding Landowners' total lot coverage.[12]

## III. Whether Landowners Have Violated Permit Limitations on the Size of the Roof Between the House and the Garage

The DRB's third and final Conclusion of Law upheld the Zoning Administrator's finding of a violation regarding the size of the roof over the enclosed area connecting Landowners' house and garage:

> Based upon the above Findings, the Development Review Board finds that Article IX Definitions, Handicapped Accessible Accommodations of the Castleton Zoning Regulations which allows that "The Development Review Board may exempt reasonable handicapped accessibility accommodations from the footprint,

---

[12] Our conclusion on this matter makes it unnecessary for us to address Landowners' arguments regarding the fact that the Second Application did not make any representation as to the size of the garage. We do note, however, that our review of the Record reveals no evidence—let alone substantial evidence—that Landowners made a representation regarding the exact size of the garage in their Second Application. As explained in footnote 3, above, the official version in the Record of the Second Application contains no representations regarding the dimensions of the garage and contains no representations that the sketch attached to the Second Application was drawn to scale. (See R. at Ex. 3.) Further, the Second Decision, which granted Permit #7131 to Landowners to build a house and detached garage, contained only two conditions, neither of which placed a limitation on the size of the garage. (See R. at Ex. 4.)

Our conclusion on the jurisdictional issue regarding the second alleged violation also makes it unnecessary for us to reach Landowners' claim that the doctrine of equitable estoppel precludes the Town from asserting a violation, given that after the garage was built, the Town Zoning Administrator issued a Compliance Memo that found the house and the garage to be in compliance with Landowners' permit. We note, however, that these circumstances strike us as quite similar to another situation where the Vermont Supreme Court found that a municipality was estopped from bringing an enforcement action. See In re Tekram Partners, 2005 VT 92, ¶ 13, 178 Vt. 628 ("Tekram Partners have shown that valid certificates of occupancy were issued by the City, and have asserted that these extend to all aspects of the project that were plainly visible to the issuing administrative officer at the time of his inspection. . . . Thus, we conclude that the City approved of the paved areas and the storage area, as built, when it issued the certificates of occupancy in 1997.").

12

> setbacks, or total lot coverage restrictions" has been violated, as the permit stated
> the size of the handicapped access roof could be 6' x 12'.

(DRB Order at 3.)

While this Conclusion of Law is not entirely clear and arguably contains some of the same flaws as the second Conclusion of Law (since the NOV did not mention Article IX of the Castleton Zoning Regulations), here we find that we can read the DRB Order as actually finding a violation of the underlying permit that was granted in the Third Decision. The alleged violation of the underlying permit was properly noticed. (See NOV at 2.)

The Town's position on this issue is that a Finding of Fact in a permit functions as a legally enforceable implied condition of that permit. The Third Decision contained the following Finding of Fact: "The applicant stated a roof covering a 6 ft. by 12 ft. area between the residence and garage would meet her handicap accessibility needs." (R. at Ex. 10.) The Order section of the Third Decision stated that "[b]ased on the Facts above," the application was approved. (Id.)

No conditions were attached to Landowners' permit approval. (Id.) Landowners therefore believed that they had permission to build what they had applied for: a 6-foot by 12-foot enclosed area, covered by a roof that extended approximately 24 feet in total width.[13] At some point after submitting their application, Landowners learned from their builder that it was prudent to extend the roof roughly another 6 feet to cover an electric service meter. Landowners never sought a permit amendment to do this, and the roof that Landowners built extends a length of somewhere between 27 and 30 feet total.

The Town found that any extension of the roof beyond 12 feet was a violation of the permit. This presents the Court with a purely legal question: does a Finding of Fact stating a representation (different from what was represented in the application) automatically create an implied condition in a permit? Although this is an on-the-record appeal, we approach this purely legal question de novo and without any deference to the DRB. See, e.g., In re Edgar Northshore Drive Variance Application, No. 292-12-07 Vtec, slip op. at 1. In our review of the legal precedent applicable to this issue, we conclude as a matter of law that the Finding of Fact at issue here cannot function as an implied condition to Landowners' permit.

The guiding principle in interpreting permit conditions is that "[c]onditions imposed by a zoning board must be expressed with sufficient clarity to give notice of the limitations on the use

---

[13] Our summary regarding the proposed width of the connection is discussed in detail in paragraph 14 of the Factual Background of this Decision.

13

of the land, and cannot incorporate by reference statements made by an applicant at a hearing." Appeal of Farrell & Desautels, Inc., 135 Vt. 614, 617 (1978). In the pursuit of clarity, the Vermont Supreme Court has directed the lower courts to refrain from finding implied conditions in a formal written zoning order that contains express conditions. See id. at 616. More recently, the Supreme Court has reiterated its skepticism toward claims of implied permit conditions:

> In the related context of zoning permit requirements, we recently addressed the issue of whether representations by a landowner, and findings of fact of a zoning board, represent implied permit conditions even though not expressed as explicit conditions of the zoning permit issued by the board. Deciding that enforcement of implied conditions would "impose a difficult if not impossible burden on interested parties to determine applicable regulatory standards," we held that "[c]onditions that are not stated on the permit may not be imposed on the permittee."

In re Stowe Club Highlands, 164 Vt. 272, 276 (1995) (alteration in original) (citing In re Kostenblatt, 161 Vt. 292, 299 (1994)).

Here, the October 17, 2007 permit issued to Landowners did not explicitly and clearly condition the permit upon the roof not exceeding 12 feet in width. In fact, unlike the previous permit that had been granted to Landowners when the DRB issued its Second Decision, the permit granted by the Third Decision does not include any explicit, written conditions. (Compare R. at Ex. 4 with R. at Ex. 10.)

Because it cannot rely on explicit conditions, the Town would have this Court construe one of the DRB's Findings of Fact as an implied condition. However, the Vermont Supreme Court has unequivocally stated that Findings of Fact cannot function as implied conditions. In re Stowe Club Highlands, 164 Vt. at 276; In re Kostenblatt, 161 Vt. at 299. Thus, as a matter of law, the DRB's Finding of Fact from its October 17, 2007 Decision cannot be enforced as an implied permit condition.

Our conclusion here is not changed by the fact that the Order section of the Third Decision stated that the application was approved "[b]ased on the Facts above." (R. at Ex. 10.) The Vermont Supreme Court has recognized that prohibiting implied conditions could impose a heavy burden on zoning boards, and so the Court has provided guidance here by highlighting two examples of ways that zoning boards can properly incorporate Findings of Fact and landowner representations as explicit conditions in a permit approval:

> [W]e have approved methods that ease any burden in imposition of permit conditions. In In re Duncan, we upheld a permit condition that approved a project

14

"pursuant to the plans, specifications, and site plans admitted into evidence" because this condition gave fair notice to interested parties that they had to determine the proposal presented to understand the permit requirements. 155 Vt. 402, 410 (1990). Similarly, in In re Denio, we approved an Act 250 permit condition that required the applicant "to complete the project consistent with the Board's findings and conclusions and the approved plans and exhibits." 158 Vt. 230, 241 (1992). Such a condition can be imposed in zoning cases.

Kostenblatt, 161 Vt. at 299 (parallel citations removed).

While the Supreme Court did not expressly elucidate the standard for properly incorporating Findings of Fact or representations as explicit conditions in a permit, the rule appears to be that whatever language a zoning board employs, the permit must give fair notice of the limitations placed upon the landowner. See id.; Clayton v. Clayton Investments, Inc., 2007 VT 38A, ¶ 13, 182 Vt. 581 ("Permit conditions must be explicit and 'must be expressed with sufficient clarity to give notice of the limitations on the use of the land.'" (citing Farrell & Desautels, 135 Vt. at 617)); see also, e.g., Bernstein v. Bd. of Appeals, Village of Matinecock, 302 N.Y.S.2d 141, 146 (N.Y. Sup. Ct. 1969) ("[C]onditions stated must be sufficiently clear and definite that the permittee and his neighbors are not left in doubt concerning the extent of the use permitted." (citations omitted)).

We find here, as a matter of law, that the October 17, 2007 permit issued to Landowners does not include language sufficient to give notice to the permittee that a specific Finding of Fact was actually an express condition in the permit. For instance, unlike In re Dunio, where the landowner was required "to complete the project consistent with the Board's findings," 158 Vt. at 241, here the permit includes no such requirement and in fact contains no conditions whatsoever. The phrase "[b]ased on the Facts above," (R. at Ex. 10), is not enough to give Landowners or others fair notice that the DRB intended its Findings of Fact to be conditions on the permit. This is particularly true here, where building a 24-foot roof is perfectly consistent with the representation stated in the Finding of Fact that only a 12-foot roof was actually needed, since homeowners often build more than the bare minimum that is currently needed.[14]

In short, the Vermont Supreme Court has clearly stated that "[p]ermit conditions must be explicit." Clayton, 2007 VT 38A, ¶ 13. Here, the condition the Town seeks to impose upon

---

[14] To the extent that the Town believes a larger roof to be inconsistent with the definition of "Handicapped Accessible Accommodations" in Article IX of the Castleton Zoning Regulations (for instance, because the larger roof might be more than the bare minimum reasonably needed), that issue was not properly before the DRB and is therefore not now properly before us, since (as mentioned above) the NOV failed to give notice to Landowners that they were in violation of Article IX. See generally Part II of this Decision, above.

Landowners was not an explicit condition, but was instead a Finding of Fact as to what may be "needed" and not an explicit limitation on the length of the roof.

The Vermont Supreme Court has further explained that a zoning board may impose as conditions their Findings of Fact if the board does so expressly and in a manner that will give fair notice to the parties of the conditions of the permit. See Kostenblatt, 161 Vt. at 299. But "[i]n the absence of such an explicit requirement, we must solely look to the permit conditions as written." Clayton, 2007 VT 38A, ¶ 13 (emphasis added). Here, the DRB failed to include an explicit condition requiring that Landowners' construction be no more than 12 feet in width or that it comply with the DRB's Findings of Facts. Thus, far from something "expressed with sufficient clarity to give notice of the limitations," Farrell & Desautels, 135 Vt. at 617, the permit issued in the Third Decision led Landowners to believe that they could construct the roof they sketched in their application. (See Byrne Aff. at ¶ 22.)[15]

For these reasons, we conclude as a matter of law that Landowners had a permit to build a roof extending approximately 24 feet in total, as was depicted in their application. (See R. at Ex. C-1 Application); see also Factual Background ¶ 14, above. The Third Decision, which granted that permit, was not appealed, and the permit was therefore a final decision that could not be challenged "directly or indirectly" in any subsequent proceeding. 24 V.S.A. § 4472(d).[16]

Although we find that Landowners had a right to build a roof covering up to approximately 24 feet in width, it is undisputed that Landowners in fact built a roof that covers somewhere between 27 and 30 feet. Landowners' only argument in this regard is that the extension they made (to cover the electric meter) is de minimus and therefore without legal effect. We disagree.

The Vermont Supreme Court has noted that it is error to create a de minimis exception to zoning laws where one does not explicitly exist. See, e.g., In re Audet, 2004 VT 30, ¶ 10, 176 Vt. 617; Conservation Law Found. v. Burke, 162 Vt. 115, 121 (1993) ("[W]e have declined to

---

[15]   Ms. Byrne's account of her discussion with the Town Zoning Administrator (see Byrne Aff. at ¶¶ 17–22) (an account that is not refuted by anything else in the Record) also raises serious equitable estoppel issues, particularly if the Town Zoning Administrator's representations led Ms. Byrne to chose not to appeal the Third Decision, but given our ruling here, we do not need to reach those issues.

[16]   The finality of zoning decisions provides yet another reason why any permit conditions must be stated explicitly, since landowners must decide whenever a permit is issued whether to appeal any of the conditions placed in that permit; if the landowner does not know that an implied condition (not explicitly stated) might exist (or, worse yet, is told that no such condition exists, see footnote 15, above), and on that basis does not appeal the permit, the landowner would unfairly be forever deprived of her right to challenge that implied condition.

read a de minimis exception into a zoning ordinance or the zoning enabling statute. If the Agency wishes to include an additional de minimis exception, it must do so explicitly." (citing In re Cumberland Farms, Inc., 151 Vt. 59, 64 (1989)); see also Marion County, Or. v. Fed'n for Sound Planning, 668 P.2d 406, 408 (Or. Ct. App. 1983) ("Were we to hold substantial compliance adequate, we would be reading into the statute words that are not there and a meaning that is not fairly implied. We may not do so."). But see Bailey v. Zoning Bd. of Adj. of City of Philadelphia, 569 Pa. 147, 165–66 (2002) (recognizing that Pennsylvania law allows for certain de minimis exceptions to zoning laws). Because neither the Vermont Legislature nor the Vermont Supreme Court has recognized a de minimis exception to zoning laws, we decline to do so here. In short, Landowners needed a permit amendment to extend the roof beyond 24 feet.

For these reasons, we **VACATE IN PART AND AFFIRM IN PART** the DRB's finding of a violation regarding the extension of Landowners' roof over the connector between their house and their garage; the portion we **AFFIRM** only relates to that portion of the roof that extends beyond the approximately 24 feet approved in Landowners' permit.

## IV.    Sanctions and Penalties

Finally, we must address additional issues that Landowners raise in their briefs. First, Landowners appear to request that we assess sanctions against the Town for bringing these alleged violations in bad faith. While we understand Landowners' frustration with the Town's actions, we find nothing in the Record that supports the claim that the Town has in any way acted in bad faith in these proceedings. Further, given our conclusion that Landowners are responsible for one part of the noticed violations, it would be inappropriate to assess sanctions here. We therefore **DENY** Landowners' request for sanctions.

Landowners also make a plea to this Court to find that any penalty imposed in this proceeding should be minimal (if anything). This issue is premature, as the Town has not yet decided whether to bring an enforcement proceeding against Landowners. We therefore **DECLINE** to reach any conclusion regarding what penalties (if any) would be appropriate here.

### Conclusion

For all the reasons more fully discussed above, we **VACATE** the DRB's finding of a violation regarding the total square footage of the footprint of Landowners' house; **VACATE** the DRB's finding of a violation regarding Landowners' total lot coverage; and **VACATE IN PART AND AFFIRM IN PART** the DRB's finding of a violation regarding the extension of

17

Landowners' roof over the connector between their house and their garage—the portion we **AFFIRM** only relates to the roof extension beyond the approximately 24 feet approved in Landowners' permit.  We also **DENY** Landowners' request for sanctions against the Town and **DECLINE** to reach any issues regarding penalties.

A Judgment Order accompanies this Decision.  This concludes the proceedings before this Court in this on-the-record appeal.

Done at Newfane, Vermont, this 15th day of July 2009.


_____
Thomas S. Durkin, Environmental Judge